No. 90-349

IN THE SUPREME COURT OF THE STATE OF MONTANA

1991

STATE OF MONTANA,

Plaintiff, Respondent,
and Cross-Appellant,

v.

DARWIN DALE GOODWIN,

Defendant and Appellant.

**FILED**

JUN 11 1991

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:    District Court of the Eighth Judicial District,
In and for the County of Cascade,
The Honorable Joel G. Roth, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Patrick F. Flaherty, Great Falls, Montana

For Respondent:

The Honorable Marc Racicot, Attorney General,
Jennifer Anders, Assistant Attorney General,
Helena, Montana; Patrick L. Paul, Cascade
County Attorney, Great Falls, Montana

Submitted on Briefs:   May 9, 1991

Decided:   June 11, 1991

Filed:

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

On August 14, 1989, the State of Montana filed an information charging the defendant, Darwin Dale Goodwin, with two counts of sexual intercourse without consent, and one count of felony assault. The alleged victim of all three counts was his daughter, Dawn Goodwin. Following a jury trial, which commenced on February 26, 1990, the jury returned its verdict, finding the defendant guilty of one count of sexual intercourse without consent, one count of misdemeanor sexual assault, and one count of felony assault. The defendant was sentenced to five years in the Montana State Prison for his conviction of sexual intercourse without consent. However, all but the first 30 days of that sentence was suspended. He was ordered to serve the first 30 days of his sentence in the Cascade County Jail. He was sentenced to terms of imprisonment for six months, and five years for the remaining misdemeanor and felony convictions, respectively. However, both of those prison terms were suspended. The defendant appeals from his conviction on all three counts. The State has cross-appealed from the sentence imposed on the defendant. We affirm the jury's verdict and the sentence imposed by the District Court.

The issues raised by the defendant, as rephrased by this Court, are:

1. Did the District Court err when it permitted testimony from the psychologist who interviewed the defendant pursuant to court order in a related "youth in need of care" proceeding?

2. Did the trial court err by refusing to receive testimony of the victim's grandmother, which was offered for the purpose of impeaching the victim's testimony?

3. Did the court improperly instruct the jury regarding the definition of "without consent"?

4. Did the court improperly instruct the jury regarding the meaning of "proof beyond a reasonable doubt"?

5. Should the District Court have granted a new trial based upon evidence discovered by the defendant subsequent to trial?

6. Considering the totality of circumstances, was the defendant denied a fair trial?

The State raises the following issue on appeal:

1. Did the District Court err when it applied the exception found in § 46-18-222(5), MCA, to the mandatory two-year sentence for sexual intercourse without consent?

## FACTUAL BACKGROUND

The defendant, Darwin Goodwin, was employed by the Montana State Civil Air Patrol, and stationed at Malmstrom Air Force Base near Great Falls, Montana. His daughter, Dawn Goodwin, testified to a series of events that occurred in February 1989 while she was a 16-year-old high school student living with her father. These events formed the basis of the charges against the defendant.

3

Dawn testified that on or about February 11 or 12 her father instructed her to go to her room, and to clean her room and then herself. After she cleaned her room he inspected it and told her to shower. She testified that after she showered he came into the room and inspected her by sticking his hand inside her pants and inserting his finger into her vagina without her permission. She testified that she submitted to that inspection out of fear that if she did not allow him to do so she would be punished physically. She testified to a long history of prior physical abuse by her father and her stepmother. This incident formed the basis for Count II of the information filed against the defendant on August 14, 1989. Count II charged the defendant with sexual intercourse without consent in violation of § 45-5-503, MCA.

At trial, the defendant denied that incident occurred. However, during an interview conducted by Great Falls Policeman, Bob Dykeman, during February 1989, the defendant admitted that the incident had occurred, but explained that he simply wanted to assure himself that his daughter was clean.

Dawn testified that on February 19 of that same year she was having a conversation with her father and stepmother during which the subject of suicide was discussed. During the conversation he went to his bedroom, retrieved a pistol, returned with the pistol, and told her to beg for her life. She testified that he started to raise the gun and point it at her, but was stopped by her stepmother. According to her testimony, he was very angry at the

4

time. She was frightened and thought that he really might shoot her. This incident formed the basis for Count III of the State's information charging the defendant with felony assault in violation of § 45-5-202(2)(b), MCA.

The defendant admitted that the incident with the gun occurred, but testified that it was in response to his daughter's statement that she felt like committing suicide, and that he was simply trying to determine whether she was serious. He stated that in the event he determined she was serious it was his intention to get counseling for her. He further testified that when his wife grabbed his hand and asked him to put the gun down, he did so. He denied pointing the gun at his daughter and telling her to beg for her life. However, according to the testimony of Officer Dykeman, when he interviewed the defendant Mr. Goodwin described the gun incident in terms fairly consistent with his daughter's description and said that he had been trying to frighten her.

The defendant's daughter testified that on February 21 she returned home from school and met a friend at the gate to the Air Force Base. After helping her friend to gain entry onto the base, the friend drove her to a location near her home where she dropped her off. Her father, having witnessed her arrival in an unfamiliar car, told her to go to her room and take off her clothes. After she did so, he came into the room, told her he thought she had been "screwing around with guys," and inspected her physically by inserting his finger into her vagina. After conducting this

5

inspection, he commented that she was ruining his sex life with his wife and asked how about if he took it out on her. She told him "no." He said "why not?" He then left the room. She testified that when her father inspected her it was without her permission. She was again in fear that if she did not permit him to do so she would be physically punished, and she had the impression that it was his intention to have sex with her. She remained in her room that day until about 11 p.m., and then ran away from home. This incident formed the basis for Count I of the State's information charging the defendant with sexual intercourse without consent in violation of § 45-5-503, MCA.

During his testimony the defendant admitted this inspection. He testified that he told his daughter to go to her room and that when he arrived in her room he told her to take off her clothes. He said that he explained to her that he wanted to know if she had been "screwing around," and then took his finger and "swiped the vagina." He also admitted that during the conversation he told her that she had been "screwing up" his love life with his wife. However, it was defendant's contention that this inspection was conducted merely for disciplinary purposes, and not for the purpose of sexual gratification.

I.

Did the District Court err when it permitted testimony from the psychologist who interviewed the defendant pursuant to court order in a related "youth in need of care" proceeding?

6

After defendant's daughter ran away from home, she eventually was referred to the Department of Family Services, and she advised them of what had happened. Based upon that information, the Department referred this matter to the Cascade County Attorney's Office, which petitioned the District Court for temporary investigative authority and protective custody of the defendant's daughter. After a hearing, the District Court granted the State's petition, placed the defendant's daughter in foster care, and ordered that the defendant complete a sex offender evaluation through the Sexual Assault Treatment Program in Helena. That evaluation was performed by Ron Silvers, a licensed professional counselor in the State of Montana. Silvers does not have a degree in clinical psychology and does not consider himself a psychologist. As part of that evaluation, the defendant was referred to Ronald Cutting, who administered a polygraph examination to the defendant.

Prior to trial, both Silvers and Cutting were listed as witnesses by the State. On January 30, 1990, the defendant moved to exclude Silvers' testimony for the reason that it would violate the patient-psychologist privilege provided for in § 26-1-807, MCA, and moved to exclude Cutting's testimony for the reason that polygraph evidence is inadmissible under Montana law. On February 23, 1990, the District Court ruled that the State would not be allowed to call Silvers or Cutting during its primary case, but left the door open for their testimony during rebuttal if the

defendant called his own psychologist, or through his own testimony placed his state of mind in issue.

The defendant's attorney, however, did not wait for rebuttal. He called both Silvers and Cutting as witnesses during the defendant's case.

In addition to the fact that he was not a psychologist, Silvers testified that at the time of trial he had no ongoing relationship with the defendant, and that in the strict clinical sense it was his opinion that he had never had a client and counselor relationship with Darwin Goodwin. He saw him as part of a court ordered evaluation and did not acknowledge that there was any confidentiality attendant to their relationship. He pointed out that, in fact, it was necessary for the defendant to sign documents authorizing release of information to anyone who had anything to do with this case. He testified that what he did was not a standard psychological evaluation.

Defendant's counsel then, over the objection of the county attorney, asked Silvers a number of questions about the defendant's referral to a polygraph examiner and the reliability of polygraphy. He had Silvers identify questions which he had prepared for the polygraph examiner, and had them admitted into evidence. The county attorney made it clear that she felt this evidence was inadmissible, and had no intention of offering it.

The only testimony given by Silvers regarding communications made by the defendant to him, was the following:

1. He testified that initially the defendant denied inspecting his daughter following her shower (the inspection which formed the basis for Count II), but eventually simply said that he could not recall it.

2. He testified that the defendant did describe to him the second inspection (the acts which formed the basis for Count I), but that he gave no specific details.

3. He testified that the defendant was quite adamant that he had no sexual intent in any of the actions that he took against his daughter.

In essence, the testimony that Silvers gave neither added to nor contradicted the testimony given by the defendant, and in no way contributed to the defendant's conviction. Any evidence regarding polygraphy was offered by the defendant's own attorney over the objection of the county attorney, and therefore, any prejudicial effect therefrom was waived by the defendant.

On appeal, the defendant raises several objections to the testimony of Ron Silvers:

1. He contends that Silvers' relationship to the defendant should be treated as that of a psychologist and a patient, and therefore, privileged pursuant to § 26-1-807, MCA;

2. He contends that admission of the defendant's conversation with Silvers violates the defendant's Fifth Amendment right against self-incrimination pursuant to the United States

9

Supreme Court's decision in Estelle v. Smith, 451 U.S. 454, 68 L.Ed.2d 359, 101 S.Ct. 1866 (1981);

3.    He contends that Lori Clark, the social worker for the Department of Family Services, entered into an agreement with the defendant to the effect that any evaluation that was done would be limited to the "youth in need of care" case; and

4.    Defendant contends that he did not waive his right to object to this testimony by calling the witness himself pursuant to this Court's decision in Beil v. Mayer, 242 Mont. 204, 789 P.2d 1229 (1990).

In Estelle v. Smith, the defendant was charged with murder, and prior to trial was ordered to undergo a psychiatric examination to determine his competency to stand trial.  The defendant was tried by a jury and convicted.  Under Texas law a second trial was then required prior to the imposition of a death sentence.  At the second trial, the state called as a witness the psychiatrist who had conducted the pretrial examination, and through that testimony established that defendant would pose a future threat to society.  The U.S. Supreme Court found that use of that testimony violated the defendant's Fifth Amendment right to be free from compelled self-incrimination.  However, it was critical to the Supreme Court's conclusion that the statements made by that defendant in that case were "unwarned statements made in a post-arrest custodial setting."  Smith, 68 L.Ed.2d at 372.  The Supreme Court added that:

10

> "Volunteered statements . . . are not barred by the Fifth Amendment," but under Miranda v. Arizona, supra, we must conclude that, when faced <u>while in custody</u> with a court-ordered psychiatric inquiry, respondent's statements to Dr. Grigson were not "given freely and voluntarily without any compelling influences" and, as such, could be used as the State did at the penalty phase only if respondent had been apprised of his rights and had knowingly decided to waive them.

<u>Smith</u>, 68 L.Ed.2d at 373 (emphasis added).

Since Miranda v. Arizona, 384 U.S. 436, 467, 16 L.Ed.2d 694, 86 S.Ct. 1602 (1966), and its progeny, <u>custodial interrogation</u> has always been a significant element of an involuntary statement in violation of the Fifth Amendment to the United States Constitution. In this case, defendant's remarks to Ron Silvers were not made while in custody. They were made after he was represented by an attorney during an appointment with a counselor, which was made with the knowledge of his attorney, at a time when his attorney could have been present, had he chosen to be there. This case is not controlled by <u>Smith</u>.

This case is more similar to Buchanan v. Kentucky, 483 U.S. 402, 97 L.Ed.2d 336, 107 S.Ct. 2906 (1987). In that case, the defendant was also accused of murder. At trial, he attempted to establish the affirmative defense of "extreme emotional disturbance," and called on his behalf a social worker who read excerpts from several reports and evaluations dealing with the defendant's mental condition. On cross-examination, the prosecutor sought to have the same social worker read from a psychological evaluation done by a court-appointed psychiatrist who examined the

11

defendant, pursuant to court order, to determine his competency to stand trial. The defendant objected to that evidence on the grounds that it would violate his Fifth and Sixth Amendment rights because counsel had not been present during the evaluation and the defendant had not been informed that the results could be used against him at trial.

The evidence was admitted and the defendant was convicted. When this issue was subsequently considered by the U.S. Supreme Court, that defendant, as the defendant in this case, relied on the Court's decision in Smith. However, the Supreme Court distinguished the Smith case on the following basis:

> This case presents one of the situations that we distinguished from the facts in *Smith*. Here petitioner's counsel joined in a motion for Dr. Lange's examination pursuant to the Kentucky procedure for involuntary hospitalization. Moreover, petitioner's entire defense strategy was to establish the "mental status" defense of extreme emotional disturbance. Indeed, the *sole* witness for petitioner was Elam, who was asked by defense counsel to do little more than read to the jury the psychological reports and letter in the custody of Kentucky's Department of Human Services. In such circumstances, with petitioner not taking the stand, the Commonwealth could not respond to this defense unless it presented other psychological evidence. Accordingly, the Commonwealth asked Elam to read excerpts of Dr. Lange's report in which the psychiatrist had set forth his general observations about the mental state of petitioner but had not described *any* statements by petitioner dealing with the crimes for which he was charged. The introduction of such report for this limited rebuttal purpose does not constitute a Fifth Amendment violation.

Buchanan v. Kentucky, 483 U.S. at 423-24.

In this case, the District Court stated that it would admit the testimony of Ron Silvers for a limited purpose. The District

12

Court ruled that if the defendant placed his state of mind in issue by calling his own psychologist as a witness or by testifying directly that even though he had committed the acts complained of, they were not committed for the purpose of sexual gratification, then the State could call Silvers in rebuttal to contradict that evidence. The District Court's ruling was squarely within the rule established by the U.S. Supreme Court in Buchanan.

It was the defendant who called Silvers, and then asked about communications made by the defendant to Silvers. To the extent that Silvers' testimony exceeded the purposes for which it was originally allowed by the District Court, it was the fault of the defendant, and he thereby waived any objection that he might have otherwise asserted based on privilege or the Fifth Amendment.

Furthermore, there was nothing in Silvers' testimony that was prejudicial to the defendant. Silvers merely repeated what he was told by the defendant; and the defendant told him the same thing that he told the jury. He denied the incident following his daughter's shower. He admitted the other inspection incident, but stated that it was solely for the purpose of discipline and not for the purpose of sexual gratification.

We conclude that pursuant to Buchanan, Silvers' testimony did not violate the defendant's Fifth Amendment right to be free from self-incrimination, and that because there is no reasonable possibility that that testimony contributed to his conviction, it is not necessary to discuss whether it was privileged or

13

inadmissible pursuant to the alleged agreement with the State. If it had been inadmissible for either of those reasons, it would have been, at most, harmless error. Brodniak v. State, 239 Mont. 110, 779 P.2d 71 (1989).

## II.

Did the trial court err by refusing to receive testimony of the victim's grandmother, which was offered for the purpose of impeaching the victim's testimony?

The defendant was charged with two counts of sexual intercourse without consent pursuant § 45-5-503, MCA. Sexual intercourse is defined at § 45-2-101(61), MCA, as "penetration of the vulva or anus of one person by any body member of another person . . . <u>for the purpose of arousing or gratifying the sexual desire of either party</u>." (Emphasis added.)

Prior to trial, the defendant took the deposition of Ruby Goodwin, who is the mother of the defendant and the grandmother of Dawn Goodwin. She testified that subsequent to the acts complained of, Dawn told her that she did not think her father had acted for sexual gratification when he inspected her. The State objected to this testimony on the grounds that it was inadmissible hearsay, and that objection was sustained.

On appeal, the defendant asserts that the testimony from Ruby Goodwin should have been admitted pursuant to Rule 613(b), Mont.R.Evid., as a prior inconsistent statement.

14

The State responds that pursuant to Rule 801(d)(1), Mont.R.Evid., the prior out-of-court statement by a witness has to be inconsistent with her trial testimony in order to form an exception to the general exclusion of hearsay evidence found in Rule 802.

During trial, in response to the defendant's cross-examination, Dawn Goodwin gave the following testimony when asked about her conversation with her grandmother:

Q. What explanation did you give to her for why you ran away?

A. I told her about the sexual stuff and beatings and everything else.

Q. Did you tell her that it was a sexual-type of inspection?

A. I told her -- I didn't put a label on it like you do. I just told her what had happened.

Q. You didn't tell her it was for discipline as opposed to a sex thing?

A. I don't remember. I don't think I did. I might have, I don't know.

We conclude that Dawn Goodwin's statement to her grandmother, as related by Ruby Goodwin, was not inconsistent with her trial testimony. Therefore, it was properly excluded by the District Court as hearsay evidence.

## III.

Did the court improperly instruct the jury regarding the definition of "without consent"?

The District Court's Instruction No. 15 to the jury defined "without consent" as follows:

> With regard to the offense of sexual intercourse without consent, the term "without consent" means the victim is compelled to submit by force or by threat of imminent death, bodily injury, or kidnapping to be inflicted on anyone.
>
> Resistance by the victim is not required to show lack of consent. Force, fear, or threat is sufficient alone to show lack of consent.
>
> The law requires only that the victim does not consent and that she do all that her age, strength and attendant circumstances make it reasonable for her to do in order to manifest her objection.

The court's instruction includes language from § 45-5-501, MCA, which defines "without consent," but adds language from § 45-5-511(7), MCA, which includes general language applicable to sexual crimes.

The defendant contends on appeal that by including the language from § 45-5-511(7), MCA, the District Court improperly diluted the State's burden of proof as established by this Court's decision in State v. Thompson, 243 Mont. 28, 792 P.2d 1103 (1990).

When reviewing jury instructions, this Court must determine whether the instructions, as a whole, fully and fairly present the applicable law of the case. State v. Lemmon, 214 Mont. 121, 129, 692 P.2d 455, 459 (1984). Here the instruction to which the defendant objects was a direct statement of the law and we find that it was not prejudicial to the defendant.

The District Court's instruction was not inconsistent with this Court's decision in Thompson, supra. In that case, we simply held that a person could not be convicted of the offense of sexual intercourse without consent unless "the victim is compelled to submit by force or by threat of imminent death, bodily injury, or kidnapping . . . ." Thompson, 792 P.2d at 1105. In this case, the jury was specifically instructed that to prove lack of consent the State had to establish that the victim was compelled to submit by "force or by threat of imminent death, bodily injury, or kidnapping . . . ." Therefore, the State's burden of proof was not something less than required by prior case law.

## IV.

Did the court improperly instruct the jury regarding the meaning of "proof beyond a reasonable doubt"?

It is within the prerogative of the trial court to determine which instructions are necessary in a particular case, and the court should instruct on every theory having support in the evidence. State v. Smith, 220 Mont. 364, 381, 715 P.2d 1301, 1311 (1986).

In its preliminary instruction to the jury at the outset of trial, the District Court instructed it that the State of Montana had the burden of proving the defendant's guilt beyond a reasonable doubt. It then defined reasonable doubt as follows:

> Proof beyond a reasonable doubt is proof of such a convincing character that a reasonable person would rely and act upon it in the most important of his own affairs.

17

Beyond a reasonable doubt does not mean beyond any doubt or beyond a shadow of a doubt.

The defendant offered an alternate instruction on reasonable doubt from Devitt & Blackmar, § 11.14. The defendant's instruction was rejected in favor of the instruction that was actually given by the court. On appeal, the defendant argues that the court's reasonable doubt instruction was inadequate because it failed to take into consideration that part of the State's proof was based upon circumstantial evidence. Beyond that, the defendant has failed to explain why his own offered instruction was preferable to the one given by the court.

In State v. Lucero, 214 Mont. 334, 693 P.2d 511 (1984), this Court specifically approved the reasonable doubt instruction given by the District Court in this case. Furthermore, we stated that more complicated instructions on reasonable doubt did not help clarify the State's burden of proof but have a tendency to confuse the jury. We suggested that this instruction, which is patterned after Model Montana Criminal Jury Instruction No. 1-004, be used in future criminal cases, and that no further elaboration of the definition would, therefore, be needed.

We conclude that the District Court correctly instructed the jury in this case regarding the meaning of reasonable doubt.

**V.**

Should the District Court have granted a new trial based upon evidence discovered by the defendant subsequent to trial?

18

After Dawn Goodwin had been removed from her parents' home, she spent between seven and eight months living with a foster parent whose name was Beatrice T. Doyle. Subsequent to trial, the defendant's attorney learned that Dawn's relationship with Ms. Doyle had not been a good one. In fact, Dawn was removed from that home and Ms. Doyle's foster parent license was subsequently revoked, due to complaints that Dawn and several others made about the quality of care that she provided.

It is the defendant's position that the State had an obligation to inform him of Ms. Doyle's existence, and to provide him with a copy of the file kept on Ms. Doyle at the Department of Family Services prior to trial. The defendant argues that by failing to do so, the State suppressed exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 10 L.Ed. 215, 83 S.Ct. 1194 (1963).

The basis for this charge by the defendant is his pretrial motion which was granted by the District Court and which requested that the State produce any exculpatory evidence and "a copy of the Department of Family Services files on Dawn, Pam and Darwin Goodwin . . . ." In response to that motion, the Department of Family Services did produce their file pertaining to Dawn Goodwin. That file was inspected by the District Court Judge who made certain portions of the file available to defense counsel to assist him in the preparation of his case.

During the defendant's motion for a new trial, which was heard on April 17, 1990, Lori Clark, who was in charge of delivering the Dawn Goodwin file to the District Court, testified that the information regarding Bea Doyle was kept in a separate Family Services' file and was not delivered because it was Lori Clark's understanding that that file had not been requested.

It is the defendant's position that had the Bea Doyle file been produced, his attorney would have subsequently interviewed her, and learned of the following exculpatory evidence which would have been of assistance to the defendant, and changed the result of his trial:

1. Bea Doyle's testimony would have established a propensity by Dawn Goodwin to assert complaints of a sexual nature;

2. Her testimony would have shown Dawn Goodwin's social promiscuity; and

3. Her testimony would have established that Dawn had not been coerced to submit to the acts with which the defendant was charged in Counts I and III.

Bea Doyle was called as a witness by the defendant during the April 17, 1990, hearing on his motion for a new trial. The only testimony that she gave regarding the victim's propensity to make complaints of a sexual nature was her testimony that Dawn reported her for "making-out" on the couch while ignoring the foster children under her care. Lori Clark testified that a similar complaint had been made by other foster children, and that Ms.

20

Doyle's license as a foster parent was subsequently suspended. However, even if we assume, as Ms. Doyle contends, that the complaint by Dawn was untrue, it was simply evidence of another act offered to prove that Dawn acted in conformity therewith when she complained about her father's acts. As such, it would have been inadmissible at trial pursuant to Rule 404(a), Mont.R.Evid. It did not meet any of the exceptions outlined in Rule 404(b), which would have made it admissible.

Ms. Doyle's only testimony regarding Dawn Goodwin's "social promiscuity" was her testimony to the effect that Dawn had a steady stream of boyfriends calling or visiting. These facts did not make any fact which was in issue more or less likely to have occurred, and would, therefore, have been inadmissible pursuant to Rule 401, Mont.R.Evid., for lack of relevance. Furthermore, pursuant to § 45-5-511(4), MCA, evidence of the sexual conduct of a victim of a sexual crime is not admissible. If sexual conduct is inadmissible, it is certainly reasonable to exclude testimony such as Ms. Doyle's that the victim had a steady stream of boyfriends calling and visiting.

Finally, Ms. Doyle's testimony on the subject of coercion was as follows:

Q. (By Mr. Flaherty) Did Dawn tell you her version?

A. Yes.

Q. Have I ever asked her for what her version is of what happened?

21

A. No, you haven't.

Q. They say on cross-examination a good lawyer never asks this question, but what did she tell you was her version of what happened?

A. She said that there was an incident where her father made her disrobe and he inserted his finger in her vagina to see if she was a virgin. I thought that was highly irregular because I think only a doctor could even tell if a person was a virgin or not or had been abused.

Q. When she communicated this to you, did she indicate that she was in fear or in any kind of terror that she submitted to this or --

A. Well, I don't think that was it. I thought the way that I understood it was that her father -- it was a command from her father which she was going to obey even if she was reluctant to do it.

We conclude that the above testimony does not establish a lack of coercion as suggested by the defendant.

There is no evidence that Bea Doyle's testimony was suppressed by the State. The evidence was that the Department of Family Services' file including information about Bea Doyle was not produced by that Department because it did not appear to have been requested by the defendant. The evidence was, furthermore, that had the file been produced it would not have contained information helpful to the defendant, other than the identity of Bea Doyle and the fact that the Department of Family Services had recommended that her foster parent license not be renewed. Finally, had the defendant been aware of Bea Doyle and interviewed her, the testimony that she had to offer would not have been exculpatory for

22

the reasons set forth above.   Therefore, her testimony does not warrant a new trial pursuant to Brady v. Maryland, supra.

The defendant's motion for a new trial was properly considered by the District Court under § 46-16-702, MCA, which provides that:

> Following a verdict or finding of guilty, the court may grant the defendant a new trial if required in the interest of justice.

The decision of whether a new trial is warranted is within the sound discretion of the trial court and should not be disturbed on appeal unless an abuse of discretion is shown.   State v. Morris, 230 Mont. 311, 320, 749 P.2d 1379, 1384 (1988).

Where the basis for a motion for a new trial is newly discovered evidence, as in this case, we have listed six criteria which should be considered by the District Court:

> 1.   The evidence must have come to the knowledge of the applicant since the trial;
>
> 2.   It was not through want of diligence that the evidence was not discovered earlier;
>
> 3.   The evidence is so material that it would probably produce a different result upon another trial;
>
> 4.   The evidence is not cumulative merely--that is, does not speak as to facts in relation to which there was evidence at the trial;
>
> 5.   The application must be supported by the affidavit of the witness whose evidence is alleged to have been newly discovered, or its absence accounted for; and
>
> 6.   The evidence must not be such as will only tend to impeach the character or credit of a witness.

State v. Greeno, 135 Mont. 580, 586, 342 P.2d 1052, 1055 (1959).

23

For the reasons previously mentioned, we conclude that the testimony of Beatrice T. Doyle was in some respects inadmissible, and in other respects did not establish those facts for which the defendant now offers it. Therefore, it could not produce a different result upon another trial, and we conclude that the District Court did not abuse its discretion when it denied the defendant's motion for a new trial.

## VI.

Considering the totality of circumstances, was the defendant denied a fair trial?

A.    INDEPENDENT EXAMINATION OF VICTIM.

Prior to trial the defendant moved for an independent examination of the alleged victim. The trial court denied that motion.

On appeal, the defendant argues that the trial court erred by denying him an independent medical examination of the victim, Dawn Goodwin. However, the defendant has not offered, nor suggested, any material evidence that could have resulted from an independent medical examination of the victim months after the alleged incidents occurred.

This issue is controlled by our decision in State v. Liddell, 211 Mont. 180, 685 P.2d 918, 924 (1984), where we stated that:

> The next specification of error is whether the District
> Court erred by refusing to compel the victim to be
> examined by defendant's psychologist.

24

There is no legal authority for such a procedure. Rule 35(a), M.R.Civ.P., allows for a mental or physical examination by a physician when the mental or physical condition of a party is in controversy. The victim in this matter is a *witness*, not a party to this action. The issue in this matter is whether the sexual intercourse was effected against her will and without her consent.

. . . . Since the victim was a witness and not a party, and since her state of mind was not at issue, it was proper for the District Court to refuse to order her examination by defendant's psychologist. To hold otherwise would permit the defense to try the victim of the crime and divert the jury's attention from the primary issue--the guilt or innocence of the defendant.

B.    CAUTIONARY INSTRUCTION.

During the victim's testimony she related a number of prior acts by her father which amounted to contact or suggestions of a sexual nature. These acts would normally have been inadmissible under Rule 404(b) if offered to prove the character of the defendant. However, they were admissible to prove that the defendant's intent on the occasions in question was sexual gratification.

On appeal, the defendant does not contend that the prior acts were inadmissible under Rule 404(b). Instead, he argues that no cautionary instruction was given, as is required pursuant to this Court's decision in State v. Just, 184 Mont. 262, 602 P.2d 957, 964 (1979).

However, at the time that the evidence of other acts was offered, the defendant neither objected to the evidence nor requested a cautionary instruction. Furthermore, after the State completed its proof and it was pointed out to the District Court

that the Just instruction had not been given, the court did give an instruction which met with the defendant's approval prior to proceeding any further. In addition, the court included a second cautionary instruction during its final instructions to the jury.

We conclude that while it would have been preferable for the cautionary instruction to have been given at the time that the evidence was introduced, the delay involved in the giving of the instruction in this case was not prejudicial to the defendant.

### C.   PROSECUTOR'S REMARKS.

During jury deliberations, the foreman asked the court, "[w]hat is required of the completion of sexual intercourse and if sexual gratification is a requirement of all three?"

Following a discussion in chambers with counsel present, the District Court clarified its instruction by pointing out that the act complained of had to be done for the purpose of "arousing or gratifying [the] sexual desire of either party."

The foreman then stated, "[s]o then it would be in order to have sexual intercourse, Mr. Goodwin would have to have penetrated his daughter in order to -- and receive sexual gratification; is that correct?" In response to that question, the District Court responded, "that's correct."

The county attorney then stated to the judge that Mr. Goodwin would not have had to receive sexual gratification as the foreman stated, but only had to commit the act with sexual gratification as his intent.

26

On appeal the defendant objects that it was improper for the county attorney to have instructed the jury on the law. We agree that counsel should avoid stating their interpretation of the law in the jury's presence in response to a question from the jury. However, § 46-20-701(2), MCA, provides that: "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded."

In this case, the prosecutor's comments were a correct statement of the law, and therefore, we conclude that the prosecutor's remarks did not adversely affect substantial rights of the defendant.

D.     INSPECTION OF FAMILY SERVICES' FILE.

Finally, defendant contends that it was error for the District Court to refuse the defense complete access to the Department of Family Services' files on Dawn Goodwin.

The District Court conducted its own inspection of those files and produced, for the defendant's use, those documents which it felt were relevant and necessary to the defense.

In this case, the District Court was bound by § 41-3-205, MCA, which provides as follows:

> (1) The case records of the department of social and rehabilitation services, the department of family services and its local affiliate, the county welfare department, the county attorney, and the court concerning actions taken under this chapter and all records concerning reports of child abuse and neglect shall be kept confidential except as provided by this section. Any person who permits or encourages the unauthorized

dissemination of their contents is guilty of a misdemeanor.

(2) Records may be disclosed to a court for in camera inspection if relevant to an issue before it. The court may permit public disclosure if it finds such disclosure to be necessary for the fair resolution of an issue before it.

We conclude that the District Court did not err by the manner in which it inspected and provided limited discovery of Dawn Goodwin's records kept by the Department of Family Services.

## CROSS-APPEAL

For its cross-appeal, the State of Montana raises the following issue:

Did the District Court err when it applied the exception found in § 46-18-222(5), MCA, to the mandatory two-year sentence for sexual intercourse without consent?

The State appeals from the District Court's sentencing order which suspended all but 30 days of defendant's sentence which resulted from his conviction of the crime of sexual intercourse without consent.

Section 45-5-503, MCA, which establishes the crime of sexual intercourse without consent, also provides the following penalty:

(2) A person convicted of sexual intercourse without consent shall be imprisoned in the state prison for a term of not less than 2 years or more than 20 years and may be fined not more than $50,000, except as provided in 46-18-222.

28

It is clear from the record that in making an exception to the minimum two-year prison term, the District Court relied on § 46-18-222, MCA, which provides as follows:

All mandatory minimum sentences prescribed by the laws of this state and the restrictions on deferred imposition and suspended execution of sentence prescribed by subsections (4), (5), and (6) of 46-18-201, 46-18-221(3), 46-18-224, and 46-18-502(3) do not apply if:

* * * *

(5) where applicable, no serious bodily injury was inflicted on the victim unless a weapon was used in the commission of the offense.

The State argues that a reasonable construction of § 46-18-222(5), MCA, requires the conclusion that that exception to the minimum sentence is applicable in only those cases where the threat of bodily injury or actual infliction of bodily injury is an essential element of the crime. It is the State's position that that is why the introductory language "where applicable" is used.

For example, § 45-9-102, MCA, provides a minimum sentence for the possession of dangerous drugs. It would make no sense to impose the minimum sentence and then excuse it in those cases where no serious bodily injury has been inflicted on the victim. Although some would disagree, possession of dangerous drugs is commonly considered a victimless crime.

On the other hand, the State offers robbery (§ 45-5-401, MCA) and aggravated assault (§ 45-5-202(2), MCA) as examples of crimes to which the exception found in § 46-18-222(5), MCA, obviously applies. The State's argument goes on to point out that both of

29

these crimes have as essential elements of the crime, the infliction or threat of bodily injury. However, in that respect they are similar to the crime of sexual intercourse without consent. In § 45-5-501, MCA, the following definition of "without consent" is provided:

> As used in 45-5-503 and 45-5-505, the term "without consent" means:
>
> (1) the victim is compelled to submit by force or by threat of imminent death, bodily injury, or kidnapping to be inflicted on anyone; or
>
> (2) the victim is incapable of consent because he is:
>
> (a) mentally defective or incapacitated;
>
> (b) physically helpless; or
>
> (c) less than 16 years old.

It is clear that the crimes of robbery, felony assault, and sexual intercourse without consent may all involve the threat or actual infliction of bodily harm.

The State points out that § 45-5-503(3)(a), MCA, increases the penalty in those cases where the victim is under 16 years of age or where bodily injury is inflicted on the victim. The State argues that it would be inconsistent for the legislature to increase the penalty under one section of the code where "bodily injury occurs," and then to waive the minimum prison term in a subsequent section where no "serious bodily injury was inflicted on the victim . . . ."

We agree that in reconciling these two provisions there is at least an ambiguity regarding the meaning of "where applicable" in those cases where the victim is under the age of 16 (therefore, the threat of or infliction of harm is not an element of the crime), or where some injury less than "serious bodily injury" has been inflicted on the victim. However, if the legislature had intended this exception to minimum sentences to be limited to certain crimes, it had it within its power to clearly state the crimes to which the section was applicable. By doing so, the legislature could have made its intention clear. It did not do so, and under these circumstances our duty is clear. We must interpret the criminal statute in a way most favorable to the private citizen against whom it is sought to be enforced, and against the state which authored it.

The District Court and this Court are compelled to follow the classic rule of construction of criminal statutes which is succinctly set forth as follows:

> Penal statutes are construed with such strictness as to safeguard the rights of the defendant. If the statute contains patent ambiguity and admits of two reasonable and contradictory constructions, that which operates in favor of a party accused under its provisions is to be preferred. Moreover, penal statutes are not to be extended in their operation to persons, things, or acts not within their descriptive terms, or the fair and clear import of the language used. Nothing can be read into penal statutes by implication.

73 Am.Jur. 2d _Statutes_ § 295.

We agree with the following rule of interpretation articulated by the United States Supreme Court over the years:

> First, as we have recently reaffirmed, "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." Rewis v. United States, 401 US 808, 812, 28 L Ed 2d 493, 497, 91 S Ct 1056 (1971). See also, Ladner v. United States, 358 US 169, 177, 3 L Ed 2d 199, 204, 79 S Ct 209 (1958); Bell v. United States, 349 US 81, 99 L Ed 2d 905, 75 S Ct 620 (1955); United States v. Five Gambling Devices, 346 US 441, 98 L Ed 179, 74 S Ct 190 (1953) (plurality opinion for affirmance). In various ways over the years, we have stated that "when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." United States v. Universal C. I. T. Credit Corp., 344 US 218, 221-222, 97 L Ed 260, 264, 73 S Ct 227 (1952). This principle is founded on two policies that have long been part of our tradition. First, "a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear." McBoyle v. United States, 283 US 25, 27, 75 L Ed 816, 818, 51 S Ct 340 (1931) (Holmes, J.). See also, United States v. Cardiff, 344 US 174, 97 L Ed 200, 73 S Ct 189 (1952). Second, because of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity. This policy embodies "the instinctive distaste against men languishing in prison unless the law-maker has clearly said they should." H. Friendly, Mr. Justice Frankfurter, and the Reading of Statutes in Benchmarks 196, 209 (1967). Thus, where there is ambiguity in a criminal statute, doubts are resolved in favor of the defendant.

United States v. Bass, 404 U.S. 336, 347-48, 30 L.Ed.2d 496, 92 S.Ct. 515 (1971).

In summary, we conclude that since the threat or infliction of actual bodily harm may, depending on the circumstances, be an

element of the offense of sexual intercourse without consent, it is reasonable to conclude that the exception to the minimum sentence found at § 46-18-222(5), MCA, when no "serious bodily injury was inflicted on the victim" is applicable to that offense. Any ambiguity regarding the applicability of this exception must be "resolved in favor of lenity."

We affirm the jury's verdict and the sentencing of the District Court.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____

_____
Justices