No. 92-157 and 92-161

IN THE SUPREME COURT OF THE STATE OF MONTANA

1993

STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

DOUGLAS D. TURNER,

Defendant and Appellant.

FILED

OCT 20 1993

CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:  District Court of the Third Judicial District,
In and for the County of Powell,
The Honorable Ed McLean, Judge presiding.


COUNSEL OF RECORD:

For Appellant:

Edmund F. Sheehy, Jr.; Cannon & Sheehy, Helena,
Montana (argued)

For Respondent:

Hon. Marc Racicot, Attorney General
Jennifer Anders, Assistant Att'y General (argued)
John R. Connor, Assistant Att'y General, Helena,
Montana

Christopher G. Miller, Powell County Attorney,
Deer Lodge, Montana

Submitted: May 26, 1993

Decided: October 20, 1993

Filed:

Clerk

Justice John Conway Harrison delivered the Opinion of the Court.

This is an appeal from a jury decision to convict appellant Douglas D. Turner (Turner) of deliberate homicide by accountability in violation of § 45-5-102(1)(a), MCA. We hold that sufficient proof was produced at trial to sustain the conviction; that the trial court did not err in denying a severance motion; and that the Montana statute providing for the imposition of a death penalty may be applied to persons found guilty under the theory of accountability. We affirm.

September 2, 1990, was the last day of the life of Gerald Pileggi, a prisoner at the Montana State Prison. Pileggi was beaten to death with baseball bats on the exercise grounds of the state prison. Two prisoners, Turner and William Gollehon, were eventually charged jointly with deliberate homicide, or in the alternative, deliberate homicide by accountability. Following a joint trial, a jury found each defendant guilty of the alternative charge of deliberate homicide by accountability.

On February 27, 1992, the District Court conducted a separate sentencing hearing for Turner in accordance with § 46-18-301, MCA, to determine the existence or nonexistence of aggravating and mitigating circumstances for the purpose of determining what sentence should be imposed. Judge McLean determined that the mitigating factors did not sufficiently outweigh the aggravating circumstances to warrant leniency in sentencing. On March 16,

2

1992, Turner was sentenced to death by lethal injection under § 46-19-103(3), MCA. The District Court stayed Turner's execution on May 16, 1992, pending appeal to this Court.

Gerald Pileggi was an inmate at the Montana State Prison. He was assigned to the high security side of the prison, or the "high side" as it is commonly called in prison language. Pileggi worked in the high side kitchen, which employed twenty-five to forty-five inmates per shift, including the two men charged with his death. Prisoners assigned to the high side actively sought kitchen duty as it was considered good duty.

In August of 1990, there was tension in the prison and this was very evident in the high side kitchen. Some of the inmates who worked in the kitchen, including Turner, did not like the fact that convicted sex offenders were working there. As it developed, there was a movement afoot to rid the kitchen of sex offenders or, according to the inmates, to take back the kitchen from the sex offenders. Pileggi was a sex offender, and in August 1990, he was attacked by three individuals. Pileggi told a correctional officer that three inmates dragged him into the dish room and beat him up, but he refused to identify the perpetrators. Turner, Gollehon, and Daryl Daniels were terminated or dropped from kitchen work crews a few days before Pileggi's death.

On September 2, 1990, Pileggi went out into the high side exercise yard. The inmates on the high side were allowed to spend time in the exercise yard every afternoon. A softball game was being played on the baseball diamond and inmates were walking around a track that circled the exercise yard. During the exercise

3

time, the yard is routinely patrolled by two correctional officers.

Two correctional officers, Beckerleg and Spangberg, were on duty that day. As they began walking around the track, they noticed that the softball game was breaking up and the inmates were moving away from the area. When the officers approached the backstop on the baseball diamond they saw an inmate lying on the ground with his head toward the backstop. When they reached the inmate they discovered it was Pileggi. His face was bloody, and the officers saw two baseball bats lying across his body.

The officers immediately initiated prison procedure and "called the yard in" --this means that the inmates were ordered to go back into their units. In addition, the two correctional officers called for medical assistance. Pileggi was removed by medical personnel, given emergency treatment, and sent by air to Missoula for treatment, but he died en route to a Missoula hospital.

The officers testified that when they found Pileggi he was unconscious and appeared to have been severely beaten about the head. Pileggi was alive but was bleeding profusely. His forehead had been spilt open, the left side of his head was caved in, and as a result of one of the blows, one of his eyes had popped out.

A registered nurse at the prison, Carla Bielby, testified to the extent of Pileggi's injuries and said that she was not able to recognize Pileggi due to the severity of his injuries. She testified that Pileggi was having great trouble breathing due to the quantity of blood in his throat. She attempted to clear his airway before transferring him to the infirmary.

4

Dr. Gary Dale, a forensic pathologist and a medical examiner at the State Crime Lab in Missoula, performed an autopsy on Pileggi the following day. Dr. Dale concluded that Pileggi died as a result of multiple injuries to the head and trunk. Dr. Dale was able to identify at least four blows, including a massive blow to the top of the head which caused the skull to cave in; a major blow to the left side of the face which collapsed the entire left side of the forehead and caused the brain to tear and the eyeball to rupture; a blow to the left jaw which caused both the upper and lower jawbones to fracture; and a blow to the breastbone. Dr. Dale testified that another blow was likely delivered to the shoulder area which tore the muscle underneath.

Dr. Dale concluded that the injuries to the top of Pileggi's head and left forehead were fatal because they caused tearing of the underlying brain. He testified that any of the blows could have been delivered while Pileggi was standing, but that the blow to the left forehead was likely struck while the victim was lying on the ground.

While approximately 250 inmates were gathered in the high side exercise yard in the prison at the time Pileggi was beaten to death, none was available to testify as to what happened, even though the beating appeared to have happened within sight of most of those prisoners. It was not until several months later, after a thorough investigation by prison officials, that inmate J. D. Armstrong volunteered information as to what happened at the time of the killing. Other witnesses testified that they did not see or know about anything that went on--not unlike the famous three

5

monkeys, they saw nothing, heard nothing, and said nothing.

Turner denied participating in the homicide and testified that he was playing horseshoes with fellow inmates Tony Allen and Gollehon at the time of the beating. Gollehon asserted his Fifth Amendment right and did not testify at the joint trial.

Armstrong testified at trial that he was playing softball in the prison exercise yard on September 2, 1990, the day of Pileggi's death. He testified that shortly after the game started, Gollehon approached him and asked him which bat was used the least. Armstrong testified that he suspected Gollehon intended to start a fight with Pileggi because Gollehon had stated a few days earlier that he was going to "mess him [Pileggi] up." He testified that later in the game, he saw Gollehon confront Pileggi behind the backstop as Pileggi was coming around the track. Gollehon had a bat in his hand, and the two men began to struggle for control of it. Armstrong testified that he saw Turner coming around the track in the opposite direction, with a bat in his hand, and that he saw Turner strike Pileggi on the left side of his face. Pileggi fell to the ground immediately, whereupon Turner and Gollehon continued to deliver blows to Pileggi's head and trunk in an axe-chopping fashion. Armstrong testified that he saw each defendant deliver four or five blows, one after the other, and that these blows were as hard as could be delivered. After striking the many blows, Armstrong testified, Gollehon flicked his bat onto Pileggi's body. Armstrong did not remember what Turner did with his bat. Armstrong testified that as soon as the other inmates realized what had happened, there was a "mass exodus" from the softball field.

6

Armstrong testified further that while waiting for guards to discover Pileggi, he saw Gollehon sitting down, though he did not see where Turner had gone. Armstrong noticed that Gollehon had blood spatters on his pants. He told Gollehon that he had better cut off his pant legs or roll them up. Gollehon rolled up his pant legs to get through the patdown search when the yard was called in. Gollehon's pants were found later during a shakedown of his cell along with a blood smeared towel. These items were wet and had been folded and placed under a pillowcase.

Inmate William Arnot was also an eyewitness to the beating and testified for the State at trial. Arnot was playing softball against Armstrong's team on the day of Pileggi's death. He corroborated Armstrong's testimony that it was Gollehon who initially approached Pileggi with the bat in hand. Arnot testified that he saw Pileggi get hit on the side of the face as he and Gollehon struggled for control of the bat and that Turner then approached and struck a blow to Pileggi, after which he "dropped like a tree." Arnot estimated that Gollehon and Turner each hit Pileggi with the bats five or six times after he hit the ground. These facts were recited to the jury and referred to during the sentencing hearing that brought about Turner's death sentence.

Another inmate witness, Greg Carpenter, testified at trial that he was not in the yard but was writing a letter in his cell during the exercise period. He testified that he heard a commotion and looked out the window to see at least nine to twelve inmates, whom he described as "sharks," convening in a frenzy in the backstop area. After the inmates dispersed, Carpenter saw a body

7

lying on the ground. He testified that he could not recognize any of the inmates.

Six other inmates testified on behalf of Turner during his case-in-chief. Inmate Puliafica testified, without identifying the individual involved, that:

> I saw a guy -- I heard an argument and I looked up and I saw a guy confronting Pileggi, he was poking him in the chest, lipping off to him, trying to provoke him to fight. And that went on for a little while. And they got into an argument that turned into a scuffle. And somebody came up behind him with a bat and hit him in the head with it. And then hit him again when he went down. And then the first individual that started it went and got a bat and they beat him.

Inmate Tony Allen testified that he was playing horseshoes with Turner and Gollehon on the afternoon of the attack. Inmate David DePue testified that he saw Turner and Gollehon in the horseshoe pits that afternoon while he was gardening nearby. Inmate Steven Wall, Turner's cellmate, testified that Turner did not appear nervous nor did he observe anything unusual about Turner or his clothing when he returned to the cell after the yard was called in on September 2, 1990. All of Turner's witnesses admitted that they did not reveal any of this information while Turner was being held in maximum security pending further investigation of the crime.

Turner raises several issues:

1. Did the District Court err when it sentenced Turner to death for his conviction of accountability for deliberate homicide?

2. Did the District Court err in refusing to grant Turner's motion for severance of trials?

3. Should this Court uphold Turner's death sentence on

8

automatic review?

The facts presented in this case require this Court to consider the following statutes: §§ 45-2-301, -302, 45-5-102(2), 46-18-220, 46-18-303, -304, and -305, MCA. For the reader's convenience, relevant portions of these statutes are set forth below.

**45-2-301. Accountability for conduct of another.** A person is responsible for conduct which is an element of an offense if the conduct is either that of the person himself or that of another and he is legally accountable for such conduct as provided in 45-2-302, or both.

**45-2-302. When accountability exists.** A person is legally accountable for the conduct of another when:

(1) having a mental state described by the statute defining the offense, he causes another to perform the conduct, regardless of the legal capacity or mental state of the other person;

(2) the statute defining the offense makes him so accountable; or

(3) either before or during the commission of an offense with the purpose to promote or facilitate such commission, he solicits, aids, abets, agrees, or attempts to aid such other person in the planning or commission of the offense. However, a person is not so accountable if:

(a) he is a victim of the offense committed, unless the statute defining the offense provides otherwise; or

(b) before the commission of the offense, he terminates his effort to promote or facilitate such commission and does one of the following:

(i) wholly deprives his prior efforts of effectiveness in such commission;

(ii) gives timely warning to the proper law enforcement authorities; or

(iii) otherwise makes proper effort to prevent the commission of the offense.

**45-5-102. Deliberate homicide.**

. . .

(2) A person convicted of the offense of deliberate homicide shall be punished by death as provided in 46-18-301 through 46-18-310, by life imprisonment, or by imprisonment in the state prison for a term of not less than 10 years or more than 100 years, except as provided

9

in 46-18-222.

**46-18-220. Sentences for certain offenses committed in state prison -- death penalty.** A person serving a sentence of imprisonment in the state prison convicted of the offense of attempted deliberate homicide, aggravated assault, or aggravated kidnapping committed while incarcerated at the state prison shall be sentenced to death or life imprisonment as provided in 46-18-301 through 46-18-310.

**46-18-303. Aggravating circumstances.** Aggravating circumstances are any of the following:

(1) The offense was deliberate homicide and was committed by a person serving a sentence of imprisonment in the state prison.

(2) The offense was deliberate homicide and was committed by a defendant who had been previously convicted of another deliberate homicide.

. . .

**46-18-304. Mitigating circumstances.** Mitigating circumstances are any of the following:

(1) The defendant has no significant history of prior criminal activity.

(2) The offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

(3) The defendant acted under extreme duress or under the substantial domination of another person.

(4) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

(5) The victim was a participant in the defendant's conduct or consented to the act.

(6) The defendant was an accomplice in an offense committed by another person, and his participation was relatively minor.

(7) The defendant, at the time of the commission of the crime, was less than 18 years of age.

(8) Any other fact that exists in mitigation of the penalty.

**46-18-305. Effect of aggravating and mitigating circumstances.** In determining whether to impose a sentence of death or imprisonment, the court shall take

into account the aggravating and mitigating circumstances enumerated in 46-18-303 and 46-18-304 and shall impose a sentence of death if it finds one or more of the aggravating circumstances and finds that there are no mitigating circumstances sufficiently substantial to call for leniency. If the court does not impose a sentence of death and one of the aggravating circumstances listed in 46-18-303 exists, the court may impose a sentence of imprisonment for life or for any term authorized by the statute defining the offense.

I

Did the District Court err when it sentenced Turner to death for his conviction of accountability for deliberate homicide?

Turner argues that the District Court committed reversible error when it sentenced him to death for his conviction of accountability for deliberate homicide, in view of the fact that the jury found him not guilty of deliberate homicide. He argues that under Montana law, the death penalty is not a possible punishment for accountability for deliberate homicide, and it is on that basis that he asks this Court to reverse his death sentence.

Turner argues that the death sentence statutes are very specific as to which crimes warrant death sentences. He argues that under § 46-18-220, MCA, the death penalty may be imposed on persons serving a sentence in Montana State Prison convicted of deliberate homicide or attempted deliberate homicide while incarcerated in the state prison, but the statute does not require the death penalty for persons convicted of accountability for deliberate homicide. It is his position that for purposes of sentencing, the important distinction between accountability for deliberate homicide and deliberate homicide must be maintained, and that to do otherwise would contravene the legislature's intention.

11

Further, Turner argues that the aggravating circumstances listed in § 46-18-303, MCA, do not include accountability for deliberate homicide and that it is only through merging the statutes that the court is able to find the existence of aggravating circumstances set forth in § 46-18-303(1) and (2), MCA.

Turner emphasizes that he was acquitted of deliberate homicide and argues that the District Court, therefore, committed reversible error in applying the aggravating circumstances set forth in § 46-18-303(1) and (2), MCA.

Turner relies on State v. Goodwin (1991), 249 Mont. 1, 813 P.2d 953, arguing that Montana's penal statutes must be strictly construed and any ambiguities must be resolved in favor of the accused. This Court noted in Goodwin that the legislature did not clearly state the crimes to which certain statutory provisions applied, and that the district court must interpret the statute in a way most favorable to the person against whom enforcement is sought.

The Montana Legislature has statutorily abrogated the common law rule of strict construction so far as the penal code is concerned. Section 45-1-102(2), MCA, provides:

> The rule of the common law that penal statutes are to be strictly construed has no application to this code. All its provisions are to be construed according to the fair import of their terms with a view to effect its object and to promote justice.

See Continental Supply Co. v. Abell (1933), 95 Mont. 148, 163, 24 P.2d 133, 137, in which this Court held that the rule that statutes in derogation of common law must be strictly construed does not apply to penal code provisions.

12

Insofar as Goodwin is in conflict with § 45-1-102(2), MCA, it is overruled. Goodwin did not address that statute, but instead involved obvious ambiguities in a statutory sentencing scheme. Thus, the rule announced in Goodwin has no application here. Here, the statutes are clear and unambiguous. The law of accountability is properly presented and understood. To interpret the statute as Turner does in his argument would frustrate the obvious legislative purpose of Montana's accountability statutes. Instead, this Court will construe the sentencing scheme for accountability the same way that the District Court did.

In response to Turner's argument, the State argues, and we agree, that the theory of accountability finds Turner legally responsible for the crime of deliberate homicide, and any punishment that is properly imposed for deliberate homicide is properly imposed for accountability.

We hold that these are not separate offenses. A person convicted of deliberate homicide by accountability is guilty of the substantive offense of deliberate homicide and must be sentenced for that offense in accordance with § 45-5-102(2), MCA.

Sections 45-2-301, -302, and -303, MCA, are taken from the language of §§ 5-1, 5-2, and 5-3 of the Illinois Criminal Code of 1961. In State v. Murphy (1977), 174 Mont. 307, 311, 570 P.2d 1103, 1105, this Court stated that in adopting a statute from another state, we adopt the construction placed on the statute by the highest court of the sister state. Accordingly, the statutory ancestors of §§ 45-2-301, -302, and -303, MCA, confirm that a person convicted of accountability for deliberate homicide is in

13

fact convicted of deliberate homicide.

The Illinois Supreme Court upheld a similar statute on accountability in the case of People v. Ruiz (Ill. 1982), 447 N.E.2d 148, cert. denied, 462 U.S. 1112 (1983); reh'g denied, 463 U.S. 1236 (1983). In that case, as here, the appellant denied he did any act causing the death of the deceased and that his conviction on the principle of accountability could not form the basis for imposition of the death sentence. See also People v. Stanciel (Ill. 1992), 606 N.E.2d 1201.

In this case, two eyewitnesses testified that both Turner and Gollehon struck numerous blows to the head and body of the deceased; that Turner's first blow with a baseball bat felled the deceased; and that thereafter, both men struck the victim numerous times in the head and body. In addition, other evidence placed the two men in the area where the assault occurred. These facts were all considered by the jury, with proper instruction to the jury setting forth the principle of accountability, and the record proves the appellant guilty as charged beyond a reasonable doubt.

In In re B.D.C. (1984), 211 Mont. 216, 687 P.2d 655, this Court explicitly established that accountability is not a separate offense from the crime for which the actor assumes accountability. In B.D.C., a youth charged with criminal homicide by accountability alleged that his case could not be transferred to the district court from youth court because he had not been charged with criminal homicide. B.D.C., 687 P.2d at 657. We rejected the defendant's contention, stating:

B.D.C. seems to be arguing that when one is charged with

14

an offense by accountability, he or she is being charged with a separate or different offense. Accountability, however, is merely a conduit by which one is held criminally accountable for the acts of another. There is no separate offense, only the underlying offense which has been physically committed by another, but for which the defendant is equally responsible because of his or her conspiring or encouraging participation.

B.D.C., 687 P.2d at 657. We note that courts of other states with similar statutory schemes which refer in some instances to the old language of accessory, aiding and abetting, and accomplice, have decided that a person guilty by accountability is guilty of the substantive crime itself. See Gordon v. State (Alaska 1975), 533 P.2d 25; State v. Weis (Ariz. 1962), 375 P.2d 735, cert. denied, 389 U.S. 899 (1967); People v. Larson (Colo. 1977), 572 P.2d 815; People v. Martin (Colo. 1977), 561 P.2d 776; State v. Shon (Hawaii 1963), 385 P.2d 830; State v. Palermo (Kan. 1978), 579 P.2d 718; State v. Baylor (Wash. 1977), 565 P.2d 99; State v. Oldham (Idaho 1968), 438 P.2d 275. Earlier Montana statutes that referred to principals and accessories have been amended.

Turner was charged with deliberate homicide under § 45-5-102(1)(a), MCA, (Count I), and with accountability for deliberate homicide in violation of § 45-2-302 and § 45-5-102(1)(a), MCA, (Count II), as set forth in the amended information. The State charged alternative violations because it was impossible to determine which defendant struck the blow that actually killed the victim. Charging accountability for deliberate homicide allowed the State to allege that the defendants aided and abetted each other in the murder of Pileggi. See State v. Duncan (1991), 247 Mont. 232, 239, 805 P.2d 1387, 1392; State v. Riley (1982), 199

15

Mont. 413, 424, 649 P.2d 1273, 1279.

Following a joint trial, the jury convicted both defendants of deliberate homicide by accountability. The District Court held a separate sentencing hearing in accordance with § 46-18-301, MCA, which provides:

> When a defendant is found guilty of or pleads guilty to an offense for which the sentence of death may be imposed, the judge who presided at the trial or before whom the guilty plea was entered shall conduct a separate sentencing hearing to determine the existence or nonexistence of the circumstances set forth in 46-18-303 and 46-18-304 for the purpose of determining the sentence to be imposed. . . .

Section 46-18-305, MCA, permits the court to impose a death sentence _only_ where it: (1) considers the aggravating and mitigating circumstances enumerated in §§ 46-18-303 and 46-18-304, MCA; (2) determines the presence of at least one of the aggravating circumstances listed in § 46-18-303, MCA; and (3) finds no mitigating circumstances that are sufficiently substantial to call for leniency. Here, the District Court found beyond a reasonable doubt that the aggravating factors in § 46-18-303(1) and (2), MCA, were present. See State v. Smith (1985), 217 Mont. 461, 705 P.2d 1087, cert. denied, 474 U.S. 1073 (1986).


II

Did the District Court err in refusing to grant Turner's motion for severance of trials?

At the time of Turner's trial, Montana's joinder and severance statute, § 46-11-404, MCA (1989), provided in relevant part:

> (3) Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same series of acts or

16

transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately, and all of the defendants need not be charged in each count.

(4) If it appears that a defendant or the state is prejudiced by a joinder of related prosecutions or defendants in a single charge or by joinder of separate charges or defendants for trial, the court may order separate trials, grant a severance of defendants, or provide any other relief as justice may require.

It is Turner's position that the District Court erred when it refused to grant him a severance, and that in doing so it denied him a fair trial. Turner argues that at the time of his trial, Montana law did not allow a joinder of defendants in a single prosecution when it would prejudice one defendant, § 46-11-404(4), MCA (1989) (amended 1991), and that although judicial economy remains an important consideration, it must be secondary to the right of the accused to a fair trial. State v. Van Pham (Kan. 1984), 675 P.2d 848.

Turner argues that denial of severance prejudiced him in two ways. First, he could not elicit his co-defendant Gollehon's testimony for his defense; second, when Gollehon was put on trial, Gollehon's defense was conducted in a manner that seriously prejudiced Turner.

At the joint trial, Gollehon asserted his Fifth Amendment right against self incrimination, the effect of which was to make him unavailable to Turner as a witness. Turner alleges that he could not effectively defend his credibility without Gollehon's testimony. Turner contends basically that he was deprived of the chance to cross-examine Gollehon; therefore the court denied him a fair trial.

17

Turner also alleges that due to his close friendship with Gollehon, a jury could infer that the overwhelming evidence against Gollehon implied that he, Turner, was involved in the killing. He further argues that no physical evidence linked him to the crime, whereas, in contrast, the torn bloody pants found in Gollehon's cell presented strong evidence of Gollehon's involvement; that evidence unfairly prejudiced Turner when severance was denied.

In considering whether there should be a joint trial, we have held that the district court must weigh the State's interest in judicial economy against the defendant's right to a fair trial:

> Joint trials speed the administration of criminal justice, conserve judicial time, lessen the burden on prospective jurors and obviate the necessity of recalling witnesses. On the other hand, the trial court must weigh these benefits against the potential prejudice to a defendant which may arise as a result of his being tried with another defendant.

State v. Strain (1980), 190 Mont. 44, 55-56, 618 P.2d 331, 338. The decision whether to grant a severance is within the sound discretion of the district court. State v. Graves (1990), 241 Mont. 533, 538, 788 P.2d 311, 314. This Court will not substitute its judgment for that of the district court. State v. Campbell (1980), 189 Mont. 107, 120-121, 615 P.2d 190, 198 (citing United States v. Cuesta (5th Cir. 1979), 597 F.2d 903, 919, cert. denied 444 U.S. 964 (1979).

In striking a balance between prejudice to a criminal defendant and judicial economy, this Court has stated that "considerations of judicial economy exert strong pressure in favor of joint trials." Campbell, 615 P.2d at 198 (citing United States v. Dohm (5th Cir. 1979), 597 F.2d 535, 540, on reh'g 618 F.2d 1169

18

(1980)).

> The factors that provide the basis for the predisposition for joint trials include expedition of the administration of justice, reduction in the congestion of trial dockets, conservation of judicial time, reduction of burden on citizens who serve on juries in terms of time and money sacrificed, and avoidance of the necessity of recalling witnesses who would otherwise have to testify only once.

Campbell, 615 P.2d at 198 (citing United States v. Brady (9th Cir. 1978), 579 F.2d 1121, 1128, cert. denied, 439 U.S. 1074 (1979)). Because of these important considerations, the burden of showing prejudice rests upon the defendant.

> In showing prejudice, it is not sufficient that the defendant prove some prejudice or that a better chance of acquittal exists if separate trials are held. Rather, the defendant must show the prejudice was so great as to prevent a fair trial. . . . Given this high standard of proof and the deference afforded the discretion of the trial court's judgment on balancing prejudice against judicial economy, reversal of a decision not to sever criminal charges is seldom granted.

Campbell, 615 P.2d at 198 (citations omitted).

Applying these considerations to the case before us, we find that the District Court did not abuse its discretion in denying Turner's motion for severance. Both defendants were charged with the same offenses, which arose out of a single incident. The State relied on the same eyewitness testimony to convict both defendants. The eyewitness testimony was the State's strongest evidence of guilt, and such testimony would have been required at both trials if Turner and Gollehon had been tried separately.

As the State's eyewitnesses were protective custody inmates, special security procedures had to be used for these witnesses as well as for all of the inmate witnesses who testified on behalf of Turner and Gollehon. Separate trials would have resulted in more

19

than the usual amount of judicial expense because of these security measures. Further, as the District Court noted, the publicity associated with the first trial might have precluded the second defendant from receiving a fair trial. The District Court concluded that:

> [B]ecause of the nature of this trial being committed at a State institution, it is going to receive statewide publicity. The second trial would be virtually an impossibility to find a well informed and educated jury that has not been tainted because of the publicity that was rendered in the previous case, and I would anticipate this case would receive statewide coverage. Secondly, because this offense was committed at the Montana State Prison, most of the witnesses listed would be coming from the Montana State Prison, as inmates, and it would create an impossible situation to try and keep all the witnesses from discussing this case with any other witness until such time as the second trial has been concluded. And in my opinion, the interest of justice would be thwarted if we were to continue the case as the witnesses would all be tainted and suspect by the time the second trial came.

Both defendants raised defenses of alibi or mistaken identity and used the same witnesses to support these defenses. There was no disagreement or apparent hostility between the defendants at trial regarding their version of events. Turner's testimony was consistent with that of his defense witnesses, and Gollehon offered no conflicting evidence that would have prejudiced Turner's case. Nor does the fact that the State was able to produce physical evidence that implicated defendant Gollehon conclusively establish prejudice.

> While a great disparity in proof may be sufficient to allow a severance in certain cases, the fact that the evidence against one codefendant is more damaging than the evidence against another one is not a ground for severance.

Brady, 579 F.2d at 1128. Brady establishes that a certain amount

20

of prejudice is to be expected in every joint trail.

Here, Turner simply ignored all of the State's circumstantial evidence that pointed to his guilt, not to mention the State's eyewitness testimony, which linked him directly to Pileggi's death. The fact that Turner and Gollehon were close friends was peripheral to the substantial number of facts that established their guilt beyond a reasonable doubt.

Although the testimony of the defense witnesses directly conflicted with that of the State's eyewitnesses, the jury resolved this conflict by its verdict. Moreover, the jury was specifically instructed by the District Court that it must find each defendant guilty of deliberate homicide or deliberate homicide by accountability, and that it was not enough to convict one on the basis of the co-defendant's guilt.

It is a well recognized principle of law that juries are presumed to follow the law as given them. Opper v. United States (1954), 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101, 109-110; McKenzie v. Risley (9th Cir 1988), 842 F.2d 1525, 1533, cert. denied, 488 U.S. 901 (1988). In view of the instructions and the evidence presented at trial, there is no basis upon which to conclude that Turner was convicted simply because he was associated with and tried alongside Gollehon.

Turner relies on an Arizona case for the proposition that a defendant may be prejudiced by the actual conduct of a co-defendant's defense to the point that severance is required. State v. Cruz (Ariz. 1983), 672 P.2d 470, 474. Cruz, however, involved conduct by co-defendant's counsel that was in no way analogous to

21

what is involved here. In Cruz, co-defendant's counsel elicited damaging testimony on cross-examination of a state's witness regarding the defendant's involvement with organized crime and other criminal activity. The Arizona Supreme Court noted that "[t]his evidence would not have come out if appellant had not been tried with [co-defendant] McCall and it would not have been admissible in the state's case at a separate trial." Cruz, 672 P.2d at 475. The Arizona court reversed the defendant's conviction, ruling that the district court's admonitions were insufficient to cure the prejudice caused by the introduction of this evidence, so that the district court should have immediately granted a mistrial or severed the cases. That is not what happened here.

Here, Gollehon did not testify, and Gollehon's counsel did not elicit evidence of other crimes committed by Turner, nor was his questioning intended to point the finger at Turner and away from Gollehon, as was the case in Cruz.

We hold that the District Court did not err in refusing to grant Turner's motion for severance.


III

Should Turner's death sentence be upheld on automatic review?

The record indicates that Turner entered the Montana State Prison at the age of sixteen, after he was convicted of deliberate homicide for taking the lives of three people. He came to the state prison as a result of a sentence he received from Judge Cox in Dawson County. At the time of that sentencing he was expecting

22

390 years of incarceration without benefit of parole--in other words, life in prison.

After sentencing, Turner was placed in the youthful offenders cube at Montana State Prison. There, he was housed with other youthful offenders and given an opportunity to participate in group activities and mental health treatment programs. In that environment he was given opportunities to correct his many problems and change his life. Instead of taking advantage of those opportunities, Turner chose to ignore them. The record indicates that Turner requested to be terminated from the youthful offenders cube. All of this information was in the hands of the sentencing judge at the time Turner was sentenced for Pileggi's death.

In assessing whether this Court should uphold Turner's death sentence, we look to the sentencing judge's conclusions wherein he stated:

> No cause appearing why the sentence should not be imposed, it is hereby the judgment of this Court that you are guilty of the underlying offense, to wit: deliberate homicide by accountability. In attempting to decide what sentence to impose in this case, Mr. Turner, I spent a great deal of time going over the reports that have been submitted concerning your childhood and the efforts towards rehabilitation that were made on your behalf by the State and all of its agencies. That includes numerous attempts at drug and alcohol rehabilitation, placement in different facilities, and all of those efforts have proved unsuccessful. The main reason they have proven unsuccessful is you have not expended one iota of energy towards seeing any of those programs to a successful end. The duty of this Court is to assure that we protect the members of society that you are placed in with. Within our society we have different sub-groups of society. Yours being the society at the Montana State Prison. I have studied section 46-18-303, and find that the aggravating circumstances stated in sub (1) and sub (2) apply to your case. I have considered your age at the time of the commission of the offense and find that you were 18 years of age, over the age of 18 at the time

23

of the commission of the offense, and therefore, under, or properly under Section 303 for aggravation consideration. Further, after looking at your childhood and the experiences you have suffered, I find that the mitigation in Section 46-18-304 does not apply at this time. There are several members of our society who have gone through the same childhood you have gone through, and have gone on to be productive and very successful members of society.

In balancing the two statutes, I find that there is no way short of imposing the death penalty that the society at the Montana State Prison can be incarcerated, and by your own statements here in Court, you do not want to be placed in the Maximum Security Unit. Therefore, it is the judgment of this Court that you be sentenced to the ultimate penalty, that is, punishment by death, and I'll set that sentencing between the hours of 12:01 a.m. and 6:00 a.m. on May 7th of 1992.

In accordance with § 46-18-112(1)(e), MCA, the District Court refused to consider any victim impact statements as a part of the presentence report. The District Court informed defense counsel at the hearing on aggravating and mitigating circumstances that the court was not going to consider the fact that Turner had recently been arraigned on charges stemming from his alleged involvement in the 1991 prison riot:

Mr. Sheehy [defense counsel], in that regard, I will advise you that I will not consider the riot in any way in relationship to this sentence.

Nothing in the thirteen pages of findings and conclusions indicates that the court was persuaded by public opinion or media, any personal bias or prejudice, any fear of community objection, or any other improper circumstances that might have affected its sentencing decision. Therefore, the first factor of § 46-18-310, MCA, has been satisfied. The second factor, a finding of aggravating circumstances, pursuant to § 46-18-303, MCA, also has been satisfied. The District Court also considered each of the

24

mitigating circumstances listed in § 46-18-304, MCA, and found that "Turner's history of abuse, his alcohol use, his prison record, his efforts toward rehabilitation, his character and prospects for rehabilitation, as well as all other particular evidence submitted in mitigation, does not outweigh the evidence presented in aggravation . . . . "

Turner does not challenge the District Court's findings in this automatic review proceeding, nor is there a legitimate basis on which the findings could be challenged. They are based on records, reports, and evaluations compiled in the course of Turner's 1987 prosecution, evidence adduced at trial including Turner's own trial testimony, and the evidence presented at the hearing on aggravating and mitigating circumstances. The record entirely supports the District Court's findings as to mitigating circumstances, and this Court affirms those findings in this automatic review procedure.

Under § 46-18-310(3), MCA, this Court is required to determine "whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." A review of this factor serves as a check against "the random or arbitrary imposition of the death penalty," which would violate the Eighth Amendment's prohibition against cruel and unusual punishment. Gregg v. Georgia (1976), 428 U.S. 153, 206, 96 S.Ct. 2909, 2940, 49 L.Ed.2d 859, 893, reh'g denied, 429 U.S. 875 (1976).

In determining whether a death sentence is disproportionate, this Court reviews the gravity of the offense, the brutality with

25

which it was committed, and the factors, if any, which led to a call for leniency, with the purpose of making certain that there has been no discriminatory action on the part of the sentencing judge. State v. Kills on Top (Vern) (1990), 243 Mont. 56, 109, 793 P.2d 1273, 1308, cert. denied, 111 S.Ct. 2910 (1991). Section 46-18-310(3), MCA, requires the court to "include in its decision a reference to those similar cases it took into consideration."

Since 1973 this Court has considered nine death penalty cases: State v. Langford (1991), 248 Mont. 420, 813 P.2d 936; Kills On Top (Vern); State v. Kills On Top (Lester) (1990), 241 Mont. 378, 787 P.2d 336, cert. denied, 111 S.Ct. 2910 (1991); State v. Dawson (1988), 233 Mont. 345, 761 P.2d 352, cert. denied, 491 U.S. 910 (1989); State v. Keith (1988), 231 Mont. 214, 754 P.2d 474; State v. Smith (1985), 217 Mont. 461, 705 P.2d 1087, cert. denied, 474 U.S. 1073 (1986); State v. Fitzpatrick (1980), on remand, 186 Mont. 187, 606 P.2d 1343, cert. denied, 449 U.S. 891 (1980); State v. Coleman (1978), 185 Mont. 299, 605 P.2d 1000, cert. denied, 446 U.S. 970 (1980); State v. McKenzie (1976), 171 Mont. 278, 557 P.2d 1023, vacated on other grounds, 433 U.S. 905 (1977), on remand, 177 Mont. 280, 581 P.2d 1205 (1978), vacated, 443 U.S. 903 (1979), on remand, 186 Mont. 481, 608 P.2d 428 (1980), cert. denied, 449 U.S. 1050 (1980).

All of these cases involved a death penalty imposed for the aggravated kidnapping and subsequent homicide of a victim. Although the circumstances surrounding the killings were different in those cases, the brutality and senselessness of the offense committed in this case is certainly comparable to, if not more

26

egregious than, the above-cited cases. Of those cases, the homicide in the Kills On Top cases is most similar in that it was a single homicide involving two defendants.

In the Kills on Top cases, the victim was beaten to death with a pipe, a tire iron and then a rock following an all-night joyride during which the victim was forced to ride naked in the trunk of the car after the defendants had robbed him. Eventually, the defendants decided that the victim must die so that they would not get caught. Although Vern Kills On Top was not present when his brother Lester delivered the final fatal blows, he participated directly in many events that led up to the killing. This Court concluded that Vern Kills On Top "was a major participant in the felony and exhibited a reckless indifference to human life." 793 P.2d at 1308. As he met the culpability standard set forth in Enmund v. Florida (1982), 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140, and Tison v. Arizona (1987), 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127, his death sentence did not constitute cruel and unusual punishment, nor was it disproportionate to his crime.

Here, Turner's conduct was significantly more culpable than that of Vern Kills On Top. The testimony of the State's eyewitnesses establishes that Turner was an active participant in the beating death of Gerald Pileggi. Turner struck the first blow which caused Pileggi to "drop[ ] like a tree." While Pileggi lay defenseless on the ground, Turner and Gollehon continued to beat him four to six times apiece with as much force as could be delivered. Thus, the evidence supports the conclusion that Turner killed, attempted to kill, intended to kill or at a minimum, acted

27

with reckless disregard for human life, and his death sentence does not violate the Eighth Amendment's prohibition of cruel and unusual punishment.

We affirm the District Court's death sentence. Aggravating circumstances exist without question, and there are no mitigating circumstances which require leniency.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

Justice Karla M. Gray, dissenting.

I respectfully dissent from the Court's opinion that Turner was properly sentenced to death for his conviction of accountability for deliberate homicide. Although the issue is addressed somewhat differently here than in the companion case of State v. Gollehon, my dissent there is applicable here as well and is incorporated herein.

In addition, I see no conflict between § 45-1-102(2), MCA, and our decision in State v. Goodwin. Both require this Court to construe penal statutes "according to the fair import of their terms." Section 45-1-102(2), MCA. Goodwin merely prohibits extending penal statutes beyond "[the statute's] descriptive terms, or the fair and clear import of the language used." 813 P.2d at 966. The Court's decision here meets neither standard; it focuses on the "separate offense" concept without ever addressing precisely how the offense for which Turner was convicted fits squarely and fairly within the language and terms of Montana's sentencing statutes. The fact is that our death penalty statutes do not, by their clear terms, include accountability for deliberate homicide. Absent legislative inclusion, the Court merely reads that offense into the statutes in violation of § 45-1-102(2), MCA, and Goodwin. I cannot agree.

Furthermore, the Court's references to Goodwin are, at best, confusing. Without much analysis, the Court concludes that Goodwin is inapplicable here. However, the Court also overrules some unspecified portion of that case "to the extent" it is in conflict

29

with § 45-1-102(2), MCA. The Court does not tell us precisely how the conflict arises. Nor does the Court explain how the statute, in effect at the time our decision in Goodwin was issued, can now-- a short two years later--require this Court to retreat from the strong language it utilized in Goodwin that we "are compelled to follow the classic rule of construction of criminal statutes" regarding lenity cited therein. Goodwin, 813 P.2d at 966-67.

If this case represents the death knell of the rule of lenity in Montana, I am saddened. More importantly, however, if this is so, the Court ought to at least say so clearly so that the district courts, the members of the practicing bar, and this Court in future cases will know the answer.

I would remand to the District Court for resentencing.

_____
Justice

Justice Terry N. Trieweiler and Justice William E. Hunt, Sr., join in the foregoing dissent of Justice Karla M. Gray.

_____
Justice

_____
Justice

October 20, 1993

## CERTIFICATE OF SERVICE

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:

Edmund F. Sheehy, Jr.
Cannon & Sheehy
P.O. Box 5717
Helena, MT 59604

William F. Hooks
Appellate Public Defender
Capitol Station
Helena, MT 59620

Hon. Joseph P. Mazurek, Attorney General
Jennifer Anders, Assistant
215 N. Sanders, Justice Bldg.
Helena, MT 59620

Christopher G. Miller
Powell County Attorney
Courthouse
Deer Lodge, MT 59722

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY: _____
Deputy