No. 83-475

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

IN THE MATTER OF
B.D.C., A Youth under the
age of Eighteen Years.

APPEAL FROM: District Court of the Fourth Judicial District,
In and for the County of Missoula,
The Honorable James B. Wheelis, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

John E. Riddiough, Missoula, Montana
McClain & Dowdall, Missoula, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Robert L. Deschamps, III, County Attorney, Missoula,
Montana

Submitted on Briefs: February 24, 1984

Decided: July 10, 1984

Filed: JUL 10 1984

*Ethel M. Harrison*
Clerk

Mr. Justice Daniel J. Shea delivered the Opinion of the Court.

Defendant youth, B.D.C, appeals from an order denying his motion to dismiss for lack of jurisdiction the State's petition for transfer, and from an order allowing transfer to adult court. On April 11, 1983, the petition was filed in the Youth Court of Missoula County, alleging that B.D.C. was a delinquent youth and that he had committed acts which if committed by an adult would constitute deliberate homicide under sections 45-5-102(a) and 45-2-302(3), MCA. The State then moved to transfer the case to adult court under section 41-5-206, MCA.

B.D.C.'s motion to dismiss was denied on grounds that the application of section 41-5-206, MCA, does not depend on whether one is charged directly or through accountability. The transfer hearing was held on June 2 and 3, 1983, and the trial court entered findings and conclusions that there was reason to believe B.D.C. committed the offense, that youth facilities were inadequate for him and that the crime had been premeditated.

There are two issues presented by the youth, B.D.C., and both are jurisdictional under section 41-5-206, MCA. First, whether the Youth Court had jurisdiction to transfer the case to adult court under section 41-5-206(a), MCA, when B.D.C. was charged with deliberate homicide by accountability. Second, whether there was substantial evidence to support the required finding of the Youth Court under section 41-5-206(d), that the youth facilities are inadequate for B.D.C. We reverse and hold that, although the Youth Court had jurisdiction to transfer the case under section

2

41-5-206(a)(1), it did not have jurisdiction under section 41-5-206(d), because the Youth Court's required finding under that section, and other related findings and conclusions, were not supported by the evidence.

This case involves a stormy relationship between a father and son, with a tragic ending. B.D.C. was born in California and his parents were divorced when he was three years old. His father moved to Missoula, Montana, and B.D.C. stayed in California with his mother. When B.D.C. was eight, his mother died of cancer. Despite the fact B.D.C. wished to stay in California with his maternal grandparents, the California court awarded custody to the father and B.D.C. went to Missoula with him.

There is substantial evidence to show that B.D.C.'s father was very hard on him and nothing B.D.C. did was "good enough." The boy's father was an alcoholic and was often mentally and physically abusive to B.D.C. while at home. The boy testified, as did his father's wife, that the boy would stay in his room so that he would not have to face his father.

B.D.C. had a close relationship with his grandmother in California (his grandfather had died one month after his mother), but because his father would not let him telephone her, B.D.C. had to use the neighbors' telephone. They were aware of the situation at B.D.C.'s home and gladly allowed him to use their phone.

From the beginning, B.D.C. had a difficult time dealing with his father's rejection and the rejection and abuse only increased during B.D.C's junior high and high school years. He tried to participate in sports and other activities to please his father, but it was to no avail. He testified to

3

some length about his father's continuous and unreasonable demands, and about his own frustrations in being unable to receive his father's love and attention. In seventh grade when his father blackened his eye, B.D.C. went to the school counselor for help with his situation. She only told him to "try harder," advice he considered a "brushoff." He also went to neighbors and friends, but there was little they could do. The point is that B.D.C. did seek outside help. It was only after years of rejection and abuse that he wrongly perceived there was no other alternative but to kill his father.

During the spring of 1983, when B.D.C.'s was sixteen and a sophomore in high school, he began talking with a neighborhood friend about killing his father. The friend told B.D.C. he would do it, and on or about April 7, 1983, while B.D.C. waited across the street, the friend shot B.D.C's father to death while he slept. Both boys disposed of the body somewhere outside of town and it was never recovered. One or two days later the neighbor boy admitted the killing to the police, and both boys were arrested.

Both issues presented concern the jurisdiction of the Youth Court to transfer B.D.C.'s case to adult criminal court under section 41-5-206, MCA. That section provides in relevant part:

> "(1) After a petition has been filed alleging delinquency, the court may, upon motion of the county attorney, before hearing the petition on its merits, transfer the matter of prosecution to the district court if:
>
> "(a) the youth charged was 16 years of age or more at the time of the conduct alleged to be unlawful and the unlawful act is one or more of the following:
>
> "(i) criminal homicide as defined in 45-5-101;

4

" . . .

"(b) a hearing on whether the transfer should be made is held in conformity with the rules on a hearing on a petition alleging delinquency, except that the hearing will be to the youth court without a jury;

"(c) notice in writing of the time, place and purpose of the hearing is given to the youth, his counsel, and his parents, guardian, or custodian at least 10 days before the hearing; and

"(d) the court finds upon the hearing of all relevant evidence that there are reasonable grounds to believe that:

"(i) the youth committed the delinquent act alleged;

"(ii) the seriousness of the offense and the protection of the community require treatment of the youth beyond that afforded by juvenile facilities; and

"(iii) the alleged offense was committed in an aggressive, violent, or premeditated manner . . ."

The first issue is whether B.D.C. is charged with criminal homicide as defined in section 45-5-101, MCA. B.D.C. contends that because he is charged by accountability --e.g., he did not pull the trigger--he is not charged "as defined in 45-5-101." B.D.C.'s challenge on this ground has no basis in law. B.D.C. seems to be arguing that when one is charged with an offense by accountability, he or she is being charged with a separate or different offense. Accountability, however, is merely a conduit by which one is held criminally accountable for the acts of another. There is no separate offense, only the underlying offense which has been physically committed by another, but for which the defendant is equally responsible because of his or her conspiring or encouraging participation.

B.D.C. is charged by accountability with deliberate homicide because he and Jim Dixon conspired to kill B.D.C.'s father. Despite the fact that only Dixon pulled the trigger,

5

B.D.C.'s admission that he helped plan and facilitate the killing supplied the trial court with sufficient grounds to believe B.D.C. committed the act as alleged. If a person has conspired to commit and facilitated the commission by another of a criminal act, he is no less guilty because he did not "pull the trigger." We hold that, for purposes of transfer to adult court under section 41-5-206(1)(a), it makes no difference whether a youth is charged directly or by accountability with one of the enumerated offenses in that section.

The second issue is dispositive. Before a youth court has jurisdiction to transfer a case to adult court, it must find that the juvenile facilities are inadequate for the youth in light of the "seriousness of the offense" and the need to protect the community. The Youth Court made the required finding, but it is not supported by the evidence. In finding no. 11, the Youth Court found:

> "11. That the staff of the Pine Hills School recommends that B.D.C. be placed in that facility for treatment but has declined to make a recommendation on whether their facilities will be adequate in view of the seriousness of the offense and the need for protection of the community."

This finding is puzzling in light of the actual recommendation from the Pine Hills staff. After the Pine Hills staff completed the 45-day evaluation ordered by the court, it agreed on a recommendation to the court. In a letter dated July 17, 1983, Pine Hills Professional Counseling Service Director, John R. Klaboe, stated:

> "To further clarify our position on B.D.C., we feel that Pine Hills School is the appropriate placement for this student. We feel that we can help him in dealing with the problems he is presently having. We do not, however, feel that the staff of Pine Hills is capable of making a recommendation in the adult court versus juvenile court question that

6

pertains to the case. We see this as a legal question, one that is beyond our capabilities."

In a subsequent letter (July 21, 1983) that accompanied the final report to the Youth Court, Mr. Klaboe stated:

"It is recommended that B.D.C. be placed at Pine Hills School. While at Pine Hills School, he can be helped to deal with his personal problems, continue his education and reside in a secure setting."

The Youth Court misinterpreted the July 17, 1983 letter to say that Pine Hills was reserving a recommendation as to whether their facility was "adequate" for B.D.C. Both letters make it clear that the Pine Hills staff concluded their facility is the proper place for him; they only reserved their recommendation on the ultimate resolution of the adult versus youth court issue.

The adequacy of the youth facility, in light of the severity of the offense and the need for the protection of the community, is only one of the factors considered under section 41-5-206 to determine whether the cause should be transferred to adult court. The court sent B.D.C. to Pine Hills so the staff could evaluate him and make a recommendation as to the adequacy of their facility for him. The staff found B.D.C. to be a bright and cooperative, though troubled, youth. He received remarks such as "excellent student," and "very cooperative." One social worker, Donna Corkins, reported that "(B.D.C.) presents an excellent and receptive candidate for therapeutic intervention." In light of all the circumstances, the staff recommended that B.D.C. be sent to Pine Hills. Finding no. 11 incorrectly restates that recommendation and is therefore not supported by any evidence.

The cause may not be transferred simply because the youth is alleged to have committed a serious offense. This Court so held in the case of In Re Stevenson (1975), 167 Mont. 220, 538 P.2d 5, at 9:

".  .  . the evidence presented at the transfer hearing was insufficient to waive jurisdiction because there was no showing that the 'seriousness of the offense and the protection of the community requires treatment of the youth beyond that afforded by juvenile facilities,' as required by section 10-1229(1)(d)(ii), (now section 41-5-206(1)(d)(ii), MCA). The State argues the very nature of the offenses demonstrates the need for treatment of the youth beyond available juvenile facilities. We cannot agree. To assume that juvenile facilities are inadequate from the mere fact that the youth is charged with a serious offense, completely ignores the rehabilitative purpose of the Act as set forth in section 10-1202 (now section 41-5-102, MCA), and is tantamount to a judicial admission the juvenile facilities in Montana are inadequate to cope with the hard core youth offender. We will not do this." (Emphasis added.)

Because there is no evidence to support the finding that the youth facility was inadequate, we can only assume the cause was transferred because the offense is a serious offense, and was premeditated. But that is insufficient.

Although our holding regarding finding of fact no. 11 is dispositive, we also hold that finding no. 10 is not supported by the evidence. The Youth Court entered finding no. 10 as follows:

"[B.D.C.] appears to be unwilling to accept any particular responsibility for his actions and does not appear to be disturbed by the killing of his father or his role in it."

To the contrary, B.D.C. never denied his involvement in his father's death. He gave a full confession to authorities. He acknowledged the moral wrong he committed in his testimony and expressed regret for the sorrow brought upon his father's relatives. It is true that B.D.C. expresses anger towards his father, but he also expresses

8

fear; fear acquired from living in a constant threatening, punitive, and degrading environment. He stated many times to the staff at Pine Hills, "If I could only have that day back, none of this would have happened." There are no reasonable grounds to support finding no. 10.

Because there was no evidence to support the court's finding that the juvenile facilities are inadequate for B.D.C. in light of the seriousness of the offense and the need to protect the community, we hold that the Youth Court had no jurisdiction to transfer the cause to adult court under section 41-5-206(d)(ii), MCA.

The cause is reversed and remanded to Youth Court with instructions to try B.D.C. as a youth.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Justices

9

Mr. Justice Fred J. Weber dissents:

I respectfully dissent from the majority opinion which concludes there was insufficient evidence to support the youth court's finding that juvenile facilities are inadequate for B.D.C. in light of the seriousness of the offense and the need to protect the community. The relevant part of section 41-5-206(1), MCA provides that a youth court may waive jurisdiction where:

> "(d) The court finds upon the hearing of all relevant evidence that there are reasonable grounds to believe that:
>
> . . .
>
> "(ii) The seriousness of the offense and the protection of the community require treatment of the youth beyond that afforded by juvenile facilities; . . . "

The standard of appellate review of a youth court's decision to waive jurisdiction is whether there is substantial credible evidence to support that determination. I find substantial evidence in the record to support the conclusion that the seriousness of the offense and the protection of the community require treatment in this case beyond that afforded by juvenile facilities.

In a compassionate manner, the majority opinion emphasizes that the homicide victim was an alcoholic and that after many years of rejection and some abuse, B.D.C. wrongly perceived there was no other alternative but to kill his father. However, that is only a partial statement of the difficult facts which had to be weighed by the youth court. The record as a whole indicates that B.D.C. may require treatment beyond that which is available from Pine Hills.

The confession of J.P.D., the friend who pulled the trigger, ultimately resulted in the investigation and arrest of B.D.C. The evidence before the youth court included

confessions by the friend who pulled the trigger and by B.D.C., describing the extensive plans for the killing, the killing itself, the disposal of the body, and their subsequent conduct. The evidence indicates that this killing was not a crime of passion or an immediate response to any abusive conduct by the father, but was instead a carefully calculated elimination of the father.

B.D.C. had discussed the killing of his father with one friend for a period of approximately two months and had planned the killing for approximately three weeks with the friend who pulled the trigger. On the night of the killing, B.D.C. left his house unlocked so that access could be gained to his sleeping father. He furnished a large bottle of vodka to his friend, who consumed about one-fourth of it in order to have the nerve to complete the act. He also furnished his own loaded .22 rifle for his friend to use and agreed to pay $200 for the killing. B.D.C. then kept watch to be sure no one was coming from approximately 1:00 a.m., when the friend entered the house, until 3:00 a.m., when his friend returned from shooting the sleeping man in the temple. The two then dressed the father's body, dragged it out of the house, loaded it into the back of a pickup truck and disposed of it. The boys wore gloves throughout the course of the offense.

Two Montana cases assist in this review. In State v. Rodriguez (Mont. 1981), 628 P.2d 280, 38 St.Rep. 578F, the defendant was convicted of deliberate homicide after transfer from youth court to district court. This Court pointed out that although the youth court had not made specific findings of fact regarding the transfer, which is perhaps the preferable practice, it was sufficient that the record showed each factor was seriously considered. Rodriguez, 628 P.2d at 283.

Here, the youth court exceeded that standard. It is clear that all factors set forth in section 41-5-206, MCA were seriously considered. The court made findings of fact regarding each factor. In addition, the youth court referred to and attempted to satisfy standards promulgated by the United States Supreme Court and the American Law Institute.

In Matter of N.C.F. (1982), 197 Mont. 390, 643 P.2d 236, this Court held that the youth court did not abuse its discretion in transferring jurisdiction to the district court where there was substantial evidence to establish reasonable grounds to believe the youth had committed the alleged murder, that the youth requires treatment and the community requires protection beyond that afforded by juvenile facilities and that the youth would not be rehabilitated by the available youth court services and facilities. N.C.F., 643 P.2d at 239.

This Court emphasized that once a youth turns eighteen, Pine Hills School begins proceedings to dismiss the youth. N.C.F., 643 P.2d at 238. The facility is unable to meet the treatment needs of an eighteen year old, as Pine Hills is primarily for younger teenagers. N.C.F., 643 P.2d at 239. These conclusions are consistent with the testimony in this case of Donald P. Lee, Pine Hills Director of Developmental Services. Mr. Lee testified that (1) the kind of treatment that Pine Hills gives "is really short term," the average length of stay per student being approximately eight months, and (2) after a student reaches eighteen, "there is not a lot in terms of treatment . . . that can take place, . . . [Since] most of these kids realize that they're at the end . . . it's really not too effective in my judgment in terms of treatment."

In N.C.F. we noted, "N.C.F. turned eighteen on October 4, 1981. Pine Hills is, for all practical purposes, unavailable to him." 643 P.2d at 238. Here, we note that B.D.C. was born February 22, 1967 and is now over seventeen years old.

Finally, the Court in N.C.F. set forth the standard of review to be applied when a youth court has granted a petition to transfer jurisdiction to district court. The test is whether there is substantial credible evidence to support the determination of the youth court. 643 P.2d at 239.

Here, twenty witnesses testified in hearings before the court on three different days. This included testimony by a psychologist from Pine Hills School. The psychologist pointed out that it did not make any difference to the Pine Hills staff whether a youth was committed to Pine Hills by the youth court or by an adult court. This underscores the fact that young persons who are convicted of crimes in district court may be sent to Pine Hills for treatment.

The majority opinion quotes from the letters of J.R. Klaboe, Chief of Pine Hills Counseling Section, pointing out that Pine Hills staff members felt they could help B.D.C. deal with his personal problems, continue his education and reside in a secure setting, but they could not make a recommendation on the legal question of which court should have jurisdiction over B.D.C.'s case. The majority opinion suggests that the youth court misinterpreted these letters in finding the facility was inadequate to meet B.D.C.'s treatment needs. However, it is important to look at all of the materials that Pine Hills furnished to the court. We will briefly review the significant reports by Pine Hills personnel.

The assigned case worker gave a three page report. She pointed out that often a youth will recount his actions and show a degree of antagonism, resentment and hostility, which tend to surface because of the mental frustration of the youth. B.D.C. did not demonstrate any of these particular emotions. He remained calm and reserved, almost as though he were narrating a story in which he was not involved. She concluded that B.D.C. must be experiencing a great deal of unresolved emotional pain, repressed anger, resentment, antagonism and confusion. She emphasized that if he is ever to have a semblance of normal life he must, by means of professional help, purge himself of that pain and anguish. She concluded that B.D.C. would definitely need therapy in order to make a positive adjustment.

The Pine Hills psychologist gave a detailed eight page report, which is difficult to summarize. He emphasized that B.D.C. had felt trapped. He pointed out that B.D.C. did have some feelings of remorse, but that his concern had to do with himself and his own future. He had not yet expressed sorrow over his father's death. The psychologist characterized as a real problem the fact that B.D.C. did not and could not seek a solution other than homicide and that he was showing no concern for being the guide in the death of his father. He was showing nearly complete blandness with a lack of real remorse.

The testimony of several friends of B.D.C. discloses that he matter of factly showed the crime scene to them and seemed very much his normal self at this time. As to B.D.C.'s reason for killing his father, one friend testified that the reason seemed to be just the way his dad would punish him for little things. This friend had suggested to B.D.C. that he should run away instead of killing his father.

-14-

In his diagnostic perceptions, the psychologist concluded that B.D.C. had perceived himself as representing good while his father represented evil, and that B.D.C. became convinced that good should win out. The psychologist suggested that B.D.C. had disassociated himself from the father and had repressed what he did because of his belief that he is good and it was appropriate to kill the father, who was evil. B.D.C. has neglected to see the similarity between his actions and the actions of his victim. The psychologist concluded that when B.D.C. realizes the similarity, he will need intensive psychological help.

The chaplain's report is also attached as a part of the forty-five-day evaluation. He expressed great concern because B.D.C. did not really see anything wrong with arranging his father's death. Although B.D.C. wished that it had not happened, he did not feel it was particularly wrong. The chaplain wondered whether B.D.C. would again use this method of resolving the situation if he meets a domineering person in his life. He concluded that B.D.C.'s value system does not coincide with the standard value system of our society, and more trouble could follow because of that. Finally he suggests that adequate intervention would probably involve long-term therapy in a setting where B.D.C. would be removed from society until he had worked through his problems to a point when he would be reasonably safe to have in a community.

The youth court pointed out in its findings of fact that B.D.C. gave a voluntary statement in which he admitted his involvement in premeditating, aiding and facilitating the killing of his father. This statement was corroborated by his friend's confession. The court found that B.D.C. had been evaluated by several mental health professionals, who

uniformly concluded that he suffers from no psychological disorder and that he is competent to stand trial and assist in his defense.

In finding of fact 10, the court stated that B.D.C. appeared unwilling to accept any particular responsibility for his actions and did not appear to be disturbed by the killing of his father or his role in it. This finding of fact is supported by the above summarized substantial credible evidence. The majority opinion finds to the contrary.

The majority opinion takes particular issue with finding of fact 11. It seems to me the majority misunderstands that finding. Pine Hills specifically declined to make a recommendation on the jurisdictional question of law. The youth court clearly recognized that Pine Hills was recommending placement of B.D.C. at that facility. The majority reasons that because Pine Hills recommended that B.D.C. be placed there for treatment, the Pine Hills staff must have concluded that their facility would be adequate to meet all of B.D.C's treatment needs.

The majority fails to address the youth court's conclusion and the substantial, supporting evidence that the type of long-term intensive therapy B.D.C. may need exceeds the short-term care Pine Hills can furnish. When all the information furnished by Pine Hills is considered together, it discloses that Pine Hills can properly care for B.D.C. at this time. However, the individual staff reports and testimony furnished reasonable grounds for the court to find that treatment beyond that available at Pine Hills may be required for B.D.C. and that juvenile facilities are inadequate in this case.

-16-

It is important to keep in mind that a recommendation by Pine Hills that B.D.C. be placed there is not inconsistent with trying B.D.C. as an adult in the district court. As pointed out by Pine Hills personnel, persons convicted as adults are sent to Pine Hills for treatment, and treatment works as effectively for them as others of their age who come under the Youth Court Act. It is also important to note that, within the juvenile justice system, a youthful offender who needs treatment or rehabilitation beyond that which is available at Pine Hills cannot be transferred to Swan River Youth Camp. The Director of Institutions may, however, transfer custody of a youth to and from either facility.

In reaching its conclusion, the majority appears to have disregarded the evidence that indicates B.D.C. may require treatment beyond that afforded by the juvenile facilities. We respectfully suggest that, in its justifiable concern for the prior mistreatment and future treatment of a sixteen year old, the majority has failed to apply the substantial credible evidence rule. Instead, it has become a trier of fact, choosing the facts which it finds to be most believable and using the same to form the basis of its opinion.

I would affirm the youth court.

Justice

-17-