No. 99-020

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 298

297 Mont. 127

991 P.2d 939

STATE OF MONTANA,

Plaintiff and Respondent,

v.

MIKE HATTEN,

Defendant and Appellant.

APPEAL FROM: District Court of the Thirteenth Judicial District,

In and for the County of Big Horn

The Honorable G. Todd Baugh, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Gary E. Wilcox, Billings, Montana

For Respondent:

Joseph P. Mazurek, Attorney General, C. Mark Fowler, Assistant Attorney General, Helena, Montana; Christine A. Cooke, Big Horn County Attorney, Hardin, Montana

---

Submitted on Briefs: September 23, 1999

Decided: December 6, 1999

Filed:

_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

1. ¶ Mike Hatten (Hatten) was convicted by a jury in the District Court for the Thirteenth Judicial District, Big Horn County, of accountability for deliberate homicide. The court sentenced Hatten to 50 years in Montana State Prison, with an additional 10 year sentence for the use of a weapon. Hatten appeals his conviction and sentence. We affirm.

2. ¶ Hatten raises three issues on appeal. We restate them as follows:

3. ¶ 1. Whether the District Court erred in failing to dismiss a juror after trial commenced.

4. ¶ 2. Whether the District Court erred in applying the weapon enhancement statute.

¶ 3. Whether the District Court erred in giving the jury an instruction on "flight."

## Factual and Procedural Background

¶ On November 14, 1997, at about 10:12 p.m., the Hardin police dispatch received a call that someone had been injured in an altercation near the gas pumps at the Town Pump convenience store in Hardin. When a law enforcement officer arrived, he found a man, later identified as Richard Whistling Elk, lying in a pool of blood with an hysterical woman bending over him. Whistling Elk had sustained five stab wounds, four to his torso and stomach area and one to his back. He died the following morning at St. Vincent's Hospital in Billings.

¶ The police investigation that followed led to charges being filed against Hatten and three others. On June 17, 1998, Hatten was charged in an amended information with accountability for deliberate homicide in violation of § 45-2-301, MCA (1997), or, in the alternative, deliberate homicide in violation of § 45-5-102(1)(b), MCA (1997). His trial commenced on July 7, 1998.

¶ Several witnesses testified at Hatten's trial to the events surrounding the stabbing. Lorrie Harris, a cashier at the Town Pump, testified that a man she later identified as Hatten, came to her cash register earlier in the evening and asked for the whereabouts of Michael Billedeaux. She testified that she knew Billedeaux because she had worked with him at one time. Harris directed Hatten to Billedeaux in the back of the store where Billedeaux was talking to Timothy Swank and Thomas Morrison. Harris testified that as she was talking to Hatten, she saw him slide a knife into his pocket. A video made from the surveillance cameras in the store identified this incident as occurring at 9:13 p.m., about one hour before Harris called the sheriff's dispatch to report the stabbing.

¶ At one time during the course of the evening, Hatten and the others were asked to leave the store because it was getting too crowded. This was due to company policy and was not the result of any misconduct on the part of Hatten, Billedeaux or the others. The four returned to the store a few minutes later.

¶ Harris also testified that Whistling Elk came into the store twice on the night he was stabbed. During his first trip, Whistling Elk, who had just gotten married earlier that day, bought a bottle of Cold Duck and some beer. Whistling Elk was in the store for the second time that evening when Hatten and the others returned. When Whistling Elk left the store, Hatten, Billedeaux, Swank and Morrison followed him out the door.

¶ Just outside the store, Hatten and the others confronted Whistling Elk. Several

witnesses saw Swank hit Whistling Elk once in the face, knocking him to the ground whereupon the four men began kicking him. Two witnesses testified that Hatten knelt down and stabbed Whistling Elk, however, other witnesses identified Billedeaux as the knife-wielding assailant.

12. ¶ Harris was working at one of the cash registers near a window that looked out onto the gasoline pumps. She testified that she looked out the window after a lady came into the store screaming, and she observed several people hitting, kicking and stabbing Whistling Elk. Harris testified that it was not Billedeaux who she saw stabbing Whistling Elk, but that he "was over him." She did not know if it was Hatten with the knife, but thought that it could have been him. Harris testified that she could only see one knife.

13. ¶ Darnell Phelan was at the Town Pump with some friends on the night of the stabbing and he observed the altercation between Whistling Elk, Hatten, and the others. Phelan testified that he first observed two guys "dancing around" in front of the gas pumps as if they were going to fight and that one of the men had a knife. Phelan initially told investigating officers that he did not know either of the men, but he later admitted that he recognized Billedeaux because of his distinctive hair style-- shaved on the sides of the head and a long pony tail in the back.

14. ¶ Phelan did not recall seeing Hatten and did not see him with a knife. He testified that while Billedeaux and Whistling Elk were "dancing around," another man hit Whistling Elk and "laid him out." Phelan recounted that, after Whistling Elk fell flat on his back, a "bunch" of people jumped in and started hitting and kicking him. Originally, Phelan disclosed that, although he could not see a knife, it looked like one of the men whom he didn't know was stabbing Whistling Elk. Phelan later testified that it was Billedeaux whom he saw lean over Whistling Elk and stab him.

15. ¶ Phelan's sister, Francesca Deputy, was at the Town Pump with Phelan that evening. She testified that she saw four or five people surrounding Whistling Elk and hitting him. She also identified Billedeaux as one of the attackers because of his distinctive hair style. Deputy did not remember seeing Hatten hitting or kicking Whistling Elk. She testified that she did observe Billedeaux kneeling over Whistling Elk.

16. ¶ Roberta Falls Down testified that she had picked up Hatten and Billedeaux earlier that night and they had driven around until about 9:00 p.m. when they picked up Swank and Morrison. She testified that between 9:00 and 10:00 p.m., she drove the four to the Town Pump three times, but that she did not go into the store on the last trip. When the four men left the Town Pump for the third time, Falls Down saw some "other guy" come walking towards them. It appeared to her that Hatten and

this other guy were arguing when Billedeaux stepped in between them. Falls Down testified that Swank then came up and knocked the guy down and that she saw Billedeaux kick the guy a couple of times.

17. ¶ Falls Down further testified that, when she heard sirens, she hollered at the four men to get into the car. After driving a short while, Falls Down stopped the car to let Swank and Morrison out and they ran off. Falls Down saw Hatten hand Billedeaux a knife and heard Hatten ask Billedeaux to hide it. She testified that Billedeaux put the knife in his pocket.

18. ¶ Sheldon Driftwood and his wife, Rosanna Well Known, testified that Billedeaux called them that evening, told them that he had been stabbed, and asked them for a ride to the hospital at Crow Agency. Driftwood and Well Known picked up Billedeaux and Hatten and drove them to the hospital where Billedeaux's leg was treated for a stab wound. Both Driftwood and Well Known testified that Billedeaux and Hatten were drunk. In addition, although Well Known testified that it was Hatten who said he had stabbed someone that evening, Driftwood testified with some uncertainty whether it was Hatten who made that statement. Well Known also testified that Hatten and Billedeaux seemed to go back and forth as to who was going to take responsibility for the stabbing. She testified that when Hatten became concerned about the whereabouts of the knife, Billedeaux responded that he had thrown it into a field after they left Falls Down's car.

19. ¶ Dr. Kenneth Mueller, a Billings pathologist, testified that Whistling Elk's injuries were stab wounds, as opposed to slicing wounds, and were centered primarily in the diaphragm area affecting the liver, stomach, gallbladder and small bowel. Mueller also testified that the wounds to the back and small bowel did not contribute to the death, but the other wounds could each have been fatal by themselves. Mueller testified that Whistling Elk would have survived for only an hour after the wounds were inflicted had he not received extensive treatment. Mueller could not testify as to whether more than one knife had inflicted the injuries.

20. ¶ On July 10, 1998, the jury found Hatten guilty of accountability for deliberate homicide and not guilty of deliberate homicide. On September 4, 1998, Hatten was sentenced to 50 years in the Montana State Prison plus an additional 10 years for the use of a weapon. Hatten appeals.

## Issue 1.

21. *¶ Whether the District Court erred in failing to dismiss a juror after trial commenced.*

22. ¶ After lunch on the first full day of testimony, the prosecutor brought to the court and defense counsel's attention accusations that one of the impaneled jurors, Sheryle McGurk, failed to reveal during voir dire that McGurk knew pertinent facts about the case. These accusations were made by Kelli Strecker, Billedeaux's former girlfriend and the mother of his child. The State had included Strecker on its witness list prior to trial, however, at the start of trial, but prior to voir dire, the State informed the court and counsel for the defense that it would not be calling Strecker to testify at trial.

23. ¶ Prior to reconvening after the lunch recess, Strecker was called to testify in an in-chambers hearing regarding the accusations she had made against McGurk. She testified that she had worked with McGurk at a local day care center and claimed that McGurk knew both Hatten and Billedeaux because they had visited Strecker at work and that McGurk did not like either one. Strecker claimed that prior to trial, she had discussed with McGurk various matters involved in the crime.

24. ¶ More specifically, Strecker claimed that she had relayed to McGurk that Hatten's accomplices, Morrison and Swank, had told Strecker that it was Hatten who had stabbed Whistling Elk. Strecker also claimed that she told McGurk about Billedeaux's version of the events of that evening; that she and McGurk read press accounts of the crime and spoke repeatedly about the case; and that McGurk was anticipating getting out of jury duty because she was acquainted with Hatten.

25. ¶ Later, after court had recessed for the day, McGurk was called into chambers for individualized voir dire. McGurk admitted that she knew Strecker, but, contrary to Strecker's assertions, McGurk testified that she did not know the individuals involved in this case and that she did not directly converse with Strecker about the case. McGurk maintained that she learned nothing about the case directly from Strecker other than that she overheard Strecker tell others that a witness had admitted to Strecker that Billedeaux had not stabbed the victim. She testified that she did not, however, overhear Strecker say who had stabbed him. McGurk asserted that she had never found Strecker to be very credible, thus she generally dismissed most things Strecker said and that she had done just that as to any statements Strecker may have made about this case while they worked together. McGurk denied the rest of Strecker's claims stating that Strecker was not telling the truth.

26. ¶ The prosecutor asked McGurk whether she had formed any opinions or come to any conclusions about the case based on what she had heard from Strecker and McGurk replied that she had not. The prosecutor also asked McGurk whether she still believed that she could set aside and put out of her mind anything that she may have heard Strecker say about the case and McGurk responded that she could. After

defense counsel had an opportunity to question McGurk, the prosecutor once again asked her whether she could set aside all of this and still remain open-minded in this trial, and she again responded that she could.

27. ¶ The following afternoon, after court had recessed for the day, counsel met in chambers with the trial judge to discuss various motions including defense counsel's motion to dismiss McGurk from the jury. Defense counsel argued that McGurk should be removed from the jury because Strecker has no motive to lie about her discussions with McGurk and if McGurk is lying about knowing Hatten and discussing this case with Strecker, then she is sitting on the jury with a preconceived idea. The prosecutor argued that McGurk should not be removed from the jury because after questioning her on her ability to put all that aside and judge this case only on the facts and evidence elicited at trial, he believed that she had been sufficiently rehabilitated to be a fair and impartial juror. He further argued that McGurk was far more credible than Strecker and that Strecker does have a motive to lie in that she is the mother of Billedeaux's child and Billedeaux is Hatten's half brother. The trial judge agreed that McGurk was "far more credible" than Strecker, thus he declined to interfere with the composition of the impaneled jury by dismissing McGurk.

28. ¶ This Court will not reverse a district court's decision regarding a juror's fitness to serve absent an abuse of discretion. *State v. DeVore*, 1998 MT 340, ¶ 12, , 292 Mont. 325, ¶ 12, 972 P.2d 816, ¶ 12 (citing *State v. Sullivan* (1994), 266 Mont. 313, 320, 880 P.2d 829, 834; *State v. Williams* (1993), 262 Mont. 530, 536, 866 P.2d 1099, 1102). Because the trial court is best able to observe the jurors and to decide the potential for prejudice when allegations of juror misconduct are raised, the trial court has significant latitude when ruling on such matters. *State v. Gollehon* (1993), 262 Mont. 293, 303, 864 P.2d 1257, 1263-64 (citation omitted). This Court gives the trial court's determination considerable weight and will defer to that determination absent a showing of prejudice. *Gollehon*, 262 Mont. at 303, 864 P.2d at 1264.

29. ¶ Hatten argues on appeal that the District Court abused its discretion in failing to remove McGurk from the jury when the risk of bias and prejudice against him was so great.

A juror's nondisclosure of requested information may constitute misconduct and a denial of an accused's right to a fair and impartial jury if the juror's nondisclosure amounts to intentional concealment. *State v. Stringer* (1995), 271 Mont. 367, 383, 897 P.2d 1063, 1073 (citing *State v. Bauer* (1984), 210 Mont. 298, 310, 683 P.2d 946, 953). Where a nondisclosure does not amount to intentional concealment and

no further evidence of bias is proven, there is no error. *State v. Woods* (1986), 221 Mont. 17, 21, 716 P.2d 624, 627. In the case *sub judice*, the State argues that McGurk's nondisclosure was not intentional and does not constitute misconduct as McGurk was never asked during voir dire for the information she supposedly failed to reveal.

30. ¶ In this case, 58 individuals, including McGurk, appeared for jury selection. Prior to questioning these individuals, the trial judge, the prosecutor and defense counsel agreed that because of the considerable amount of media attention given this case and because there were four separate individuals charged in the case, the prospective jurors would be asked as a group whether they had prior knowledge of the case or were related to or were friends with any of the individuals involved.

31. ¶ As to the question of prior knowledge, the following discussion was held between the trial judge and defense counsel, Gary Wilcox:

THE COURT: Of course it's not just knowledge of the case, it's whether they have formed an opinion that they can't set aside.

MR. WILCOX: Right.

THE COURT: And whether they do not have the ability to decide the case based on the evidence in the courtroom. I could ask them that. Is that what you had in mind?

MR. WILCOX: Yes, yeah.

THE COURT: And then those that think they may have a problem in those areas can raise their hands.

Hence, after the roll was called and the prospective jurors were sworn in, the trial judge addressed the prospective jurors and stated:

[T]here will, I assume, since this is a case wherein Deliberate Homicide is the charge, that there may have been some pretrial publicity in newspapers or radio or TV news reports. You are not disqualified from being a juror simply because you may have heard about this case or may have read a newspaper article or had a news report or account of this case.

On the other hand, you do have to be able to set aside what prior knowledge, if any,

you may have about the case and decide the case based on the evidence that's introduced in Court and testimony from witnesses that will be given in Court. So the possibilities are that you haven't heard, you don't know anything about this case or maybe you have heard or read something about this case. If you have, maybe you have formed an opinion, maybe you haven't.

But what you have to be able to do is assure--be certain in your own mind as well as being able to state to the State of Montana and to Mr. Hatten, the defendant, that you will be able to decide the case based on the evidence from the witness stand, that you can set aside any information that you may already have about the case.

32. ¶ At that point, the trial judge asked for a show of hands of any of the 58 prospective jurors that were either related to Hatten or "have some prior knowledge about the case which you think has influenced you to the extent that you won't be able to set it aside and form the--base your decision in the case based on what you hear from the witness stand." Seven of the prospective jurors raised their hands. McGurk was not one of them. The trial judge then asked the prospective jurors whether any of them were related to the victim or to any of the other individuals charged in the case. An additional four of the prospective jurors signified that they were. These eleven prospective jurors were then individually interviewed in chambers.

33. ¶ When court reconvened, the clerk called the names of the first 27 jurors who had not as yet been excused. McGurk was not among them, however, she was present while these prospective jurors were questioned by counsel. During this questioning process, the prosecutor asked several questions of the 27 prospective jurors, including: "Do any of you know Mike Hatten or [are] related to him in any way?" and "has anybody heard anything about this case, read anything about this case, discussed this case with anyone?" Counsel then qualified this last question by asking: "Did you form any opinions or come to any conclusions about this case based on what you read?" and "You can set aside what you have heard and judge this just on the evidence you hear in the courtroom?"

34. ¶ When McGurk was finally called to fill in for a prospective juror that had been excused, she was asked by the prosecutor if she had heard all of the discussions up to that point and whether she had "[a]ny concerns or issues that have been raised this far that we need to talk about?" She replied in the negative. Later, toward the end of questioning, the prosecutor asked McGurk directly whether there was any reason that she could think of why she would not be a fair and impartial juror and she replied there was not.

35. ¶ In summary, our review of the record in this case does not evidence any intentional concealment or misconduct on McGurk's part. McGurk was not asked directly whether she knew anything about the case, but whether she knew anything about the case *that would influence her to the extent that she would not be able to set it aside and base her decision in the case based on what she heard from the witness stand.* Hence, her failure to indicate that she overheard Strecker discuss the case is not evidence of intentional concealment, but, rather

that she believed that she could set any prior knowledge of the case aside and judge the case on the evidence presented at trial.

36. ¶ Furthermore, while all the prospective jurors were asked whether they knew Hatten or Billedeaux, McGurk's failure to respond in the affirmative to that question is also not an indication of intentional concealment or misconduct. Strecker had indicated to the court that McGurk knew these two because they visited Strecker at work. While they may have visited Strecker, that does not prove that McGurk ever spoke to them or that McGurk even knew who they were. Additionally, McGurk cannot be accused of concealing her acquaintance with Strecker. Since Strecker was no longer to be a witness in the case, the prospective jurors were not asked whether they knew her.

37. ¶ While we have stated that it is the rule in this State that "if jury misconduct is shown tending to injure the defendant, prejudice to the defendant is presumed," *Stringer*, 271 Mont. at 383-84, 897 P.2d at 1073 (citations omitted), we have also stated that "nondisclosure, without more, does not amount to misconduct tending to prejudice the appellant," *Woods*, 221 Mont. at 21, 716 P.2d at 627.

38. ¶ In *Woods*, members of the jury panel sitting in the jury box were asked during voir dire whether they had ever been victims of any crime. Following a lunch recess, a member of the panel was dismissed and another prospective juror took her place. The prosecuting attorney asked this prospective juror whether he had any definite responses to any of the questions asked earlier. The prospective juror replied that he did not. However, it was learned a few days after a verdict was rendered in that case, that the juror had in fact been the victim of a crime, he had been burglarized three times. We determined in *Woods* that the juror's omission was inadvertent and unintentional, hence it did not prejudice the defendant's right to an impartial jury or his right to due process. *Woods*, 221 Mont. at 21, 716 P.2d at 626-27.

39. ¶ So too in the instant case, we hold that McGurk's omission was inadvertent and unintentional and does not amount to misconduct tending to prejudice Hatten's right

to an impartial jury or his right to due process. Hatten's counsel has failed to establish any basis to show McGurk was an unsuitable juror.

40. ¶ As we stated previously, because the trial court is best able to observe the jurors and to decide the potential for prejudice when allegations of juror misconduct are raised, the trial court has significant latitude when ruling on such matters, *Gollehon*, 262 Mont. at 303, 864 P.2d at 1264, and we will not reverse a district court's decision regarding a juror's fitness to serve absent an abuse of discretion, *DeVore*, ¶ 12.

41. ¶ Accordingly, finding no abuse of discretion in this case, we hold that the District Court did not err in failing to dismiss McGurk from the jury panel after trial commenced.

## Issue 2.

42. ¶ *Whether the District Court erred in applying the weapon enhancement statute.*

43. ¶ The jury acquitted Hatten on the charge of deliberate homicide and convicted him on the charge of accountability for deliberate homicide for which the District Court sentenced him to 50 years in the Montana State Prison. The District Court also sentenced Hatten to an additional 10 years for the use of a weapon pursuant to § 46-18-221, MCA, the weapon enhancement statute, which provides:

**Additional sentence for offenses committed with a dangerous weapon.** (1) A person who has been found guilty of any offense and who, while engaged in the commission of the offense, knowingly displayed, brandished, or otherwise used a firearm, destructive device, as defined in 45_8_332(1), or other dangerous weapon shall, in addition to the punishment provided for the commission of such offense, be sentenced to a term of imprisonment in the state prison of not less than 2 years or more than 10 years, except as provided in 46_18_222.

44. ¶ Hatten argues on appeal that imposition of this additional sentence was error because

it was not shown that he was the one that actually stabbed Whistling Elk or that he supplied the knife that was used to stab Whistling Elk. Hatten makes much of the fact that he was seen with a knife more than 50 minutes before the stabbing. He claims there was no evidence that he still had that knife in his possession at the time of the stabbing; that, prior to the stabbing, he gave that knife to Billedeaux (whom

Hatten claims actually stabbed Whistling Elk); or that, even if he had given the knife to Billedeaux, he did so with the knowledge that an offense was being planned. In that manner, Hatten attempts to distinguish his case from this Court's determination in *State v. Mazurkiewicz* (1990), 245 Mont. 172, 799 P.2d 1066, wherein we upheld a defendant's sentence of an additional eight years under the weapon enhancement statute for providing the gun that was used in the commission of a crime by another.

45. ¶ In that case, Mazurkiewicz was driving to Townsend with a group of friends when they met Larry Beckwith. After some friendly conversation, Beckwith agreed to take two of Mazurkiewicz's friends to Alaska and help them find jobs. As it happened, Beckwith was also driving to Townsend. At some point during the trip, one of Mazurkiewicz's friends, Roy Duncan, joined Beckwith in his truck. Shortly before reaching Townsend, both Beckwith and Mazurkiewicz pulled their vehicles to the side of the road whereupon Duncan left Beckwith's truck to speak with Mazurkiewicz. Duncan asked Mazurkiewicz for his gun so that he could use it to rob Beckwith. Mazurkiewicz gave Duncan the gun and Duncan went back to Beckwith's truck. The two vehicles then separated. Sometime later, Mazurkiewicz met up with Duncan at a gas station. Duncan told Mazurkiewicz that he and an accomplice had killed Beckwith during the robbery with Mazurkiewicz's gun. *Mazurkiewicz*, 245 Mont. at 174, 799 P.2d at 1067-68.

46. ¶ The issue in that case was whether Mazurkiewicz's conduct, which consisted of handing the weapon to an accomplice who later committed the robbery and murder, was sufficient to qualify as "use of a weapon" under the weapon enhancement statute. This Court determined that it did. *Mazurkiewicz*, 245 Mont. at 176, 799 P.2d at 1069. In making that determination, we stated: "As an accomplice to these crimes, Mazurkiewicz is equally responsible for the crimes to the same degree as his confederates, who actually perpetrated the acts." *Mazurkiewicz*, 245 Mont. at 176, 799 P.2d at 1069.

47. ¶ The evidence presented in the case *sub judice* shows that Hatten did more than hand an accomplice a weapon as in *Mazurkiewicz*. Hatten was present at and actively participated in the altercation with Whistling Elk. In addition, Harris testified that she saw Hatten in possession of a knife prior to the stabbing and Falls Down testified that she saw Hatten hand Billedeaux a knife after the stabbing and heard Hatten ask Billedeaux to hide it. Furthermore, while some witnesses testified that it was Billedeaux who stabbed Whistling Elk, two witnesses stated that it was Hatten who actually stabbed him.

48. ¶ Hatten also argues that the weapon enhancement statute was incorrectly applied in

his case because, by acquitting him on the charge of deliberate homicide, the jury was effectively saying that he was not the one that used a knife to stab Whistling Elk. He contends that whether or not he had a weapon was not essential to the jury's determination on the charge of accountability for deliberate homicide, thus it was never proven that he was the one that used a weapon in the commission of the offense.

49. ¶ The State argues that the jury's not guilty verdict on Hatten's deliberate homicide charge did not communicate that Hatten did not murder Whistling Elk by stabbing him to death, but rather, that Hatten did not murder him alone. Consequently, the State argues that the District Court correctly applied the weapon enhancement statute.

50. ¶ We agree. Although Hatten was not convicted of deliberate homicide because the jury could not find, beyond a reasonable doubt, that Hatten was *the* individual that stabbed Whistling Elk, Hatten was found guilty of accountability for Whistling Elk's death. In *In re B.D.C.* (1984), 211 Mont. 216, 687 P.2d 655, this Court explicitly established that accountability is not a separate offense from the crime for which the actor assumes accountability. There we stated:

Accountability . . . is merely a conduit by which one is held criminally accountable for the acts of another. There is no separate offense, only the underlying offense which has been physically committed by another, but for which the defendant is equally responsible because of his or her conspiring or encouraging participation.

*B.D.C.*, 211 Mont. at 220-21, 687 P.2d at 657.

51. ¶ Furthermore, a person convicted of deliberate homicide by accountability is guilty of the substantive offense of deliberate homicide. *State v. Turner* (1993), 262 Mont. 39, 50, 864 P.2d 235, 242, *cert denied*, 513 U.S. 827, 115 S.Ct. 96, 130 L.Ed.2d 46 (1994). We stated in *Turner* that "the theory of accountability finds [the defendant] legally responsible for the crime of deliberate homicide, and any punishment that is properly imposed for deliberate homicide is properly imposed for accountability." *Turner*, 262 Mont. at 50, 864 P.2d at 241-42. If a person has conspired to commit and has helped another to commit a criminal act, he is no less guilty because he did not "pull the trigger." *State v. Gollehon* (1993), 262 Mont. 1, 27, 864 P.2d 249, 265-66, *cert denied*, 513 U.S. 827, 115 S.Ct. 95, 130 L.Ed.2d 45 (1994).

52. ¶ Hatten contends that *Turner* and *Gollehon* are distinguishable from his case because the question in each of those cases and the reason both Turner and Gollehon

were convicted of accountability for deliberate homicide rather than deliberate homicide, was not which defendant inflicted the blows (numerous witnesses testified they both did), but who struck the fatal blows. Hatten contends that it was not proven in his case that he inflicted any injuries upon Whistling Elk with a knife, let alone any fatal injuries.

53. ¶ In the context of a charge of accountability, this is a distinction without a difference. As we previously stated, accountability is not a separate offense from the crime for which the actor assumes accountability. *B.D.C.*, 211 Mont. at 220-21, 687 P.2d at 657. The jury did not acquit Hatten of stabbing Whistling Elk, but rather, the jury determined that he did not commit the homicide alone. Because of his participation in the events surrounding Whistling Elk's death, Hatten is equally responsible for having stabbed Whistling Elk to death. Since the jury found Hatten accountable for Whistling Elk's death, it logically follows that Hatten is also accountable for the manner in which Whistling Elk met his death--by being stabbed with a knife.

54. ¶ Accordingly, we hold that the District Court did not err in applying the weapon enhancement statute and sentencing Hatten to an additional term of years for the use of a weapon.

## Issue 3.

55. ¶ *Whether the District Court erred in giving the jury an instruction on "flight."*

56. ¶ The standard of review of jury instructions in a criminal case is whether the instructions as a whole, fully and fairly instruct the jury on the law applicable to the case. *State v. Johnson*, 1998 MT 289, ¶ 28, 291 Mont. 501, ¶ 28, 969 P.2d 925, ¶ 28, *cert denied*, ___ U.S. ___, 119 S.Ct. 1504, 143 L.Ed.2d 657 (citing *State v. Weaver*, 1998 MT 167, ¶ 28, 290 Mont. 58, ¶ 28, 964 P.2d 713, ¶ 28; *State v. Patton* (1996), 280 Mont. 278, 286, 930 P.2d 635, 639). A trial court has broad discretion when it instructs a jury. *Johnson*, ¶ 28 (citing *Weaver*, ¶ 28; *State v. Ross* (1995), 269 Mont. 347, 358, 889 P.2d 161, 167). Furthermore, a trial court may give a jury instruction when it is relevant to evidence or issues in a case, and when the instruction "is supported either by some evidence or some logical inference from other evidence presented at trial." *Johnson*, ¶ 35 (quoting *Patton*, 280 Mont. at 289, 930 P.2d at 641-42).

57. ¶ In the instant case, the jury was instructed as follows:

If you are satisfied that the crime charged in the Information has been committed by

someone, then you may take into consideration any testimony showing, or tending to show, flight by the defendant. This testimony may be considered by the jury as a circumstance tending to prove a consciousness of guilt, but is not sufficient of itself to prove guilt. The weight to be given such circumstance and significance if any, to be attached to it, are matters for the jury to determine.

This instruction stems from the 1990 Montana Criminal Jury Instructions published by the State Bar of Montana and is based upon the authority of *State v. Walker* (1966), 148 Mont. 216, 419 P.2d 300.

58. ¶ In the present case, Hatten objected to the "flight" instruction, not on the basis that it was an incorrect statement of the law, but, rather, that it was "unnecessary in this case, did not fit the facts, and is unduly prejudicial to a defendant." He argues that a "flight" instruction "should only be given when there is definitive evidence of flight or avoidance of arrest or prosecution."

59. ¶ Hatten contends that he did not attempt to avoid arrest or prosecution because he remained in the Hardin area until he was charged and that he even went into the sheriff's office to give a statement. In support of his argument, Hatten points to several of the cases wherein an instruction on "flight" was upheld claiming that the reason the instruction was upheld in each case was because the defendant fled the State or at least the city where the crime was committed. *See State v. Byers* (1993), 261 Mont. 17, 861 P.2d 860, *overruled on other grounds by State v. Egelhoff* (1995), 272 Mont. 114, 900 P.2d 260 and *State v. Rothacher* (1995), 272 Mont. 303, 901 P.2d 82 (defendant, after shooting two Montana State University students on the campus at Bozeman, drove to his home in East Helena);*State v. Kills on Top* (1990), 241 Mont. 378, 787 P.2d 337, *cert denied*, 516 U.S. 1177, 116 S.Ct. 1273, 134 L. Ed.2d 220 (1996) (defendant dumped the victim's body in Wyoming and returned to Billings); *State v. Campbell* (1990), 241 Mont. 323, 787 P.2d 329 (defendant fled to Idaho with cash and other items belonging to the victim).

60. ¶ As the State points out in its brief on appeal, Hatten misstates the law governing "flight" instructions when he suggests that such an instruction is not appropriate where the defendant did not or cannot get very far away. In *Johnson*, we determined that leaving a crime scene, even in a closed environment like a prison, can constitute "flight." *Johnson*, ¶ 36.

61. ¶ In that case, Johnson was a Montana State Prison inmate accused of beating another inmate to death in one of the bathrooms located near the high-side recreation yard at the prison. Upon realizing that the officers monitoring the

recreation yard activities had spotted him and were approaching the bathroom, Johnson left the bathroom and quickly walked away. When the officers ordered Johnson to stop, he ran toward his housing unit, where he was apprehended. *Johnson*, ¶¶ 9-15.

62. ¶ Johnson contended on appeal that the District Court erred in giving an instruction on "flight" because there can be no "flight" in a prison environment. We affirmed the District Court's use of this instruction and stated:

The act of running away which constitutes a flight in law and thus affords a basis for an inference of consciousness of guilt . . . requires neither a physical act of running nor a far-away haven.

*Johnson*, ¶ 36 (quoting *Walker*, 148 Mont. at 226, 419 P.2d at 306). Central to our decision in Johnson was the idea that even in the limited environment of a prison, a defendant may flee to wherever he thinks is safe to dispose of evidence or avoid detection. *Johnson*, ¶ 36.

63. ¶ In the case *sub judice*, Hatten's flight was relevant to the issue of the extent of his knowledge of and involvement in Whistling Elk's homicide. Additionally, more than sufficient evidence supports the use of the flight instruction because several witnesses saw Hatten jump into a car and leave the scene after the stabbing. One witness testified that Hatten and the others took off running, jumped into a car, and sped away. Another witness testified that the four "split." Still another witness testified that Hatten and the others ran away. Falls Down, the driver of the car, testified that when she heard police sirens, she told Hatten and the others to get into the car, and when they did, she drove off.

64. ¶ The fact that Hatten stayed in the Hardin area and did not run to a "far-away haven" is inconsequential and does not alter the fact that he fled. As we pointed out in *Johnson*, flight includes fleeing, even a short distance, to wherever a defendant thinks is safe to dispose of evidence. *Johnson*, ¶ 36. Such was the situation in the case before us on appeal. Well Known testified that she heard Hatten and Billedeaux discussing how they disposed of the knife after leaving the Town Pump.

65. ¶ Therefore, we conclude that the instruction on flight was relevant to evidence in the case and was supported by the evidence presented at trial.

66. ¶ Nevertheless, we recently determined in *State v. Hall*, 1999 MT 297, ___ P.2d ___, 56 St.Rep. ___, that a jury instruction on flight may be an unnecessary comment on the evidence by the trial court and that the better policy *in future cases*

where evidence of flight has been properly admitted is to reserve comment to counsel, rather than the court. Therefore, although we affirmed the use of this instruction in *Hall*, we concluded that jury instructions on the significance of flight should no longer be given.

67. ¶ In the case before us, Hatten, unlike the defendant in *Hall*, did not argue, either before the trial court or on appeal, that the instruction on flight was an improper comment on the evidence, thus, it would be improper for us to reverse the District Court on that basis. "A party may not assign as error any portion of the instructions or omission from the instructions unless an objection was made specifically stating the matter objected to, *and the grounds for the objection*, at the settlement of the instructions." *State v. Grimes*, 1999 MT 145, ¶ 37, 982 P.2d 1037, ¶ 37, 56 St.Rep. 571, ¶37 (emphasis added) (quoting § 46-16-410(3), MCA). "A party's assertion of error 'must stand or fall on the ground relied on by the trial court.'" *State v. Henderson* (1994), 265 Mont. 454, 459, 877 P.2d 1013, 1016 (quoting *State Dep't of Highways v. DeTienne* (1985), 218 Mont. 249, 256, 707 P.2d 534, 538).

68. ¶ Furthermore, Hatten has not shown that he was prejudiced by the "flight" instruction, hence any perceived error is not reversible. "A cause may not be reversed by reason of any error committed by the trial court against the convicted person unless the record shows that the error was prejudicial." *Hall,* ¶ 47 (quoting § 46-20-701(1), MCA).

69. ¶ Accordingly, we hold that the District Court did not err in giving the jury an instruction on "flight" in this case, but, we reiterate our holding in *Hall* that instructions on "flight" should no longer be given.

70. ¶ Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ J. A. TURNAGE

/S/ JIM REGNIER

/S/ WILLIAM E. HUNT, SR.

No

/S/ W. WILLIAM LEAPHART